Thomas SOVALIK, Appellant,

v.

STATE of Alaska, Appellee.

No. 2109.

Supreme Court of Alaska.

June 27, 1980.

David C. Stewart, Asst. Public Defender, Fairbanks, Brian C. Shortell, Public Defender, Anchorage, for appellant.

James P. Doogan, Jr., Asst. Dist. Atty., Harry L. Davis, Dist. Atty., Fairbanks, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

MATTHEWS, Justice.

On August 29, 1977, the North Slope Borough police in Barrow received a report that two human bodies had been discovered. Barrow police officers immediately traveled to the place of discovery, a stretch of beach on the Arctic Ocean some five miles from Barrow and almost a mile from the nearest human habitation. Upon arrival, the officers found the bodies of Gregory Jay Underwood and Donna Hendershot in sleeping bags in a small tent. An autopsy revealed that both victims had died several days before as a result of multiple shotgun wounds.

Six days of continuous investigation by the Borough police and by Alaska State Troopers followed. During that period more than thirty persons were interviewed. One of the first was Thomas Sovalik who was interviewed on August 29th at a tent where he was staying approximately three-quarters of a mile from the scene of the murders. Sovalik stated that he had never seen the victims and knew nothing about them. There were several other persons staying in other tents near Sovalik's and they were also interviewed by Borough police with negative results.

By Sunday morning, September 4, 1977, Borough police chief Kim Moeller decided that since the initial interviews had been unproductive, all persons who had been contacted up to that point would be reinterviewed, beginning with those physically located closest to the scene. Sovalik was requested by the police to come to police headquarters for an interview. He agreed, and was transported in a police vehicle. At approximately 11:44 a.m. on September 4 he was interviewed by Chief Moeller. After general questioning in which he again denied seeing the victims, Moeller "decided to attempt a bluff."

I took a latent fingerprint that was on a bulletin board—it was put up there as a sample by another officer—I took it down; I showed it to [Sovalik] at that time. I said that it was a latent that was taken off of some of the property from the victims—specifically water bottles, I believe I mentioned—and that we thought it was his. I made the comment that we had found his fingerprint on the water bottle; did he want to tell us anything about it. His response to that was, "all I took was a flashlight." At that point I stopped; immediately I read him his rights.

After being given a recitation of his rights pursuant to *Miranda v. Arizona*,[1] Sovalik said "I don't want to talk about it right now." Moeller then asked Sovalik to wait outside in the public hallway. Sovalik did so and was not placed under guard or restrained. After Moeller conferred with others on his staff about what to do next, Sovalik was asked if he would consent to a search of his residence for the flashlight. He agreed and signed a printed waiver of search form. He then accompanied Moeller and another police officer to his home where he produced a small flashlight and gave it to the officers. The officers and Sovalik then returned to police headquarters where Sovalik again waited in the public hallway unrestrained and unguarded. The time was approximately 1:45 p.m. At about 2:00 p.m. Sovalik was placed in a cell. He was not then formally charged, although Moeller later stated that he believed he then had probable cause to arrest Sovalik for the misdemeanor offense of receiving and concealing stolen property, based on the flashlight Sovalik admitted having taken from the victims' tent. A "booking slip" charging this crime was prepared at 12:38 a.m., September 5, 1977.

After locking up Sovalik the police officers' next step was to obtain search warrants to search Sovalik's residence, his grandfather's residence, and his tent. The only items of potential importance which were obtained were two 12 gauge shotguns belonging to Sovalik, which were turned over to the police by his grandfather.

After assisting in executing the warrants, lieutenant James Christensen returned to police headquarters where, at approximately 6:00 p.m. on September 4, he brought Sovalik from his cell to an office and began to interview him. Christensen advised Sovalik of his *Miranda* rights. Sovalik stated that he understood them and signed a printed waiver of rights form. A 28 minute tape recorded interview followed in which Sovalik explained that he had taken the flashlight from the victims' tent, drew a diagram of the tent area, but denied shooting into the tent. Christensen turned off the tape recorder and drank coffee while Sovalik smoked a cigarette. In Christensen's words:

I explained the seriousness of what had happened out there to Mr. Sovalik, explained to him that if he knew anything else about it, if he had been involved in any way, that he didn't need to feel ashamed or guilty; he could talk to me about it. He then admitted that he would talk to me in more detail as to what had happened out there, and quietly confessed to shooting into the tent.

In the interview which followed, which was not tape recorded because Sovalik seemed to be inhibited by the recorder, Sovalik explained that he had fired several shots into the victims' tent. The interview lasted until approximately 7:30 p.m. at which time Sovalik ate dinner. At about 9:00 p.m. Christensen asked Sovalik how he was feeling. Sovalik indicated that he had a pain in his foot and he was taken to the hospital for an examination. The examination revealed a minor problem, for which Sovalik was given aspirin.

Sovalik was then taken back to police headquarters, arriving shortly after 11:00 p.m. At this time Christensen turned on a tape recorder and again read Sovalik his *Miranda* rights. Sovalik agreed to talk further about the murders and signed another waiver of rights form. In the interview

---

1. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

which followed, which took approximately twenty-four minutes, Sovalik essentially repeated his previous confession, adding that he had heard someone inside the tent yell during the shooting, and that afterwards he had thrown the expended shell casings into the ocean. Sovalik stated that he would be willing to go to the scene of the crime the next day to show Christensen where he had thrown the shells.

The next day, a holiday, Christensen conducted another interview of Sovalik beginning at 12:48 p.m. which lasted about 40 minutes. This was also tape recorded and preceded by a *Miranda* warning and an executed waiver of rights form. Christensen and Sovalik then proceeded to the scene, where a videotape was made of Sovalik demonstrating his actions at the time of the crime. The crime reenactment ended at 3:41 p.m. Sovalik was then returned to his cell at police headquarters and was not interviewed further.

Christensen called the Barrow magistrate at about 10:00 p.m. of that day, September 5, and informed her that Sovalik was under arrest for murder. Bail was set over the telephone and Sovalik's arraignment scheduled for September 6. The arraignment was conducted as scheduled the next day.

Prior to the trial Sovalik's counsel moved to suppress all of Sovalik's statements and all physical evidence resulting from them. The motion was denied. A jury trial was held which resulted in Sovalik being convicted on both counts of first degree murder. Sovalik was sentenced to concurrent terms of life imprisonment.

Sovalik's main contention on appeal is that his confessions should have been suppressed as having been given involuntarily. He cites such factors as his youth, lower than average intelligence, difficulty with the English language, the lie told by the police regarding his fingerprint, and the unnecessary delay in bringing him before a magistrate. When considered together, he argues, these factors compel the conclusion that his confession was not the product of his free will.

"A confession is not admissible into evidence unless it is voluntary. In determining whether a confession is the product of a free will or was the product of a mind overborne by coercion the totality of circumstances surrounding the confession must be considered." *Ladd v. State*, 568 P.2d 960, 967 (Alaska 1977) (citations omitted).

The United States Supreme Court has articulated the test for voluntariness of a confession as follows:

> But a confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.

*Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568, 573 (1897); cited in *Sprague v. State*, 590 P.2d 410, 413 n.6 (Alaska 1979). Among the circumstances which should be considered on the issue of voluntariness of a confession are:

> The age, mentality and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.

*Sprague v. State*, 590 P.2d 410, 414, *quoting Brown v. United States*, 356 F.2d 230, 232 (10th Cir. 1966). "The prosecution has the burden of showing that there is sufficient evidence to support a determination, by a preponderance of the evidence, that the admission or confession was voluntary." *Sprague v. State*, 590 P.2d at 413.

■ In evaluating the admissibility of a confession, only the circumstances which precede the confession need be reviewed. *United States v. Mitchell*, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944); *Jackson v. United States*, 313 F.2d 572 (D.C.Cir.1962); *Lockley v. United States*, 270 F.2d 915 (D.C. Cir.1959); Annot. 19 A.L.R.2d 1331, 1345 (1951). Sovalik confessed to the murders in detail on September 4, the day of his arrest, and confessed again on September 5. We

will analyze only the admissibility of the September 4 confessions because those given subsequently were only cumulative, and any error committed in admitting them would necessarily be harmless, if the September 4 confessions were admissible.

At the time he was questioned Sovalik was nineteen years of age. His intelligence level has been described as "borderline" and "low average." He had completed the eighth grade in school, had a reading ability in English between the second and fourth grade levels and was able to speak English adequately although it is not his first language. Both before and after the trial he was examined by several psychiatrists who found him to be emotionally disturbed but having no major mental disorder or illness. He was not under the influence of drugs or alcohol at the time he was questioned. He had had extensive prior exposure to law enforcement authorities.[2]

■ We see nothing in the circumstances of the questioning of September 4th which would be sufficient to overcome Sovalik's free will. He was not subjected to prolonged or exhaustive questioning. He was not physically deprived of any needs and the police seem to have been solicitous concerning his health since they transported him to the hospital for a minor foot problem. He was given *Miranda* warnings before he made incriminating statements.

■ Sovalik was told, untruthfully, that his fingerprint had been found on a bottle at the scene of the crime, but this artifice[3] was not coercive and is not one which would have a tendency to produce an untruthful confession.[4]

■ Likewise, we do not believe that the delay in presentment of Sovalik to a magistrate as required by AS 12.25.150(a)[5] and Alaska Rule of Criminal Procedure 5(a)(1)[6] renders the confessions involuntary. Sovalik was only held in custody for some four and one-half hours on a Sunday afternoon before he confessed. Thereafter, he was given dinner and taken to the hospital and immediately upon his return he made a second confession. We see nothing in that time sequence which would tend to have a coercive impact.[7]

---

2. Sovalik had previously been convicted of assault with a deadly weapon and sentenced to ninety days imprisonment with sixty days suspended, and burglary in a dwelling and petty larceny, arising out of the same incident, and given sentences of thirty and twelve days to be served concurrently. In addition, Sovalik had an extensive juvenile record, including charges of breaking and entering, arson, joy riding, injury to personal property, assault and assault on a police officer. As a minor he had often been institutionalized both in correctional centers and in group foster homes.

3. Similar deceptions are reported in *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), and *State v. Winters*, 27 Ariz.App. 508, 556 P.2d 809 (1976). *See, generally*, Annot. 99 A.L.R.2d 772 (1965).

4. Trickery in obtaining a confession is one factor to be considered in determining whether it is voluntary, *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), but the use of trickery does not per se render a confession involuntary and most authorities hold that confessions produced by trickery are admissible so long as the device employed would have no tendency to produce an untruthful confession. *See* Annot. 99 A.L.R.2d 772, 783 (1965).

5. AS 12.25.150(a) provides:

The person arrested shall be taken before the judge or magistrate without unnecessary delay, and in any event within 24 hours after his arrest, including Sundays and holidays. This requirement shall apply to municipal police officers to the same extent as it does to state troopers.

6. Alaska R.Crim.P. 5(a)(1) provides:

Except when the person arrested is issued a citation for a misdemeanor and immediately thereafter released, the arrested person shall be taken before the nearest available judge or magistrate without unnecessary delay. Unnecessary delay within the meaning of this section (a) is defined as a period not to exceed twenty-four hours after arrest, including Sundays and holidays.

7. Sovalik does not argue that a violation of the "without unnecessary delay" requirement of AS 12.25.150(a) would render his confessions per se inadmissible. That was the federal rule, *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) until it was "overruled" by Congress in the Omnibus Safe Streets and Crime Control Act, 18 U.S.C. § 3501. *See United States v. Warme*, 572 F.2d 57 (2nd Cir.) *cert.*

Based on the foregoing review of the circumstances surrounding Sovalik's confessions of September 4th, we conclude that there is ample evidence to support the trial court's finding that Sovalik's freedom of choice was not impaired and that his confessions were given voluntarily.

Sovalik's next claim is that the court erred in failing to give a diminished capacity instruction first proposed and then withdrawn by the State. We find no error because the only evidence of diminished capacity which was presented at the trial related to diminished capacity caused by alcohol intoxication. On that subject a separate instruction was given which properly advised the jury that such intoxication could have a bearing on the issue of specific intent which the state would have to prove as an element of murder in the first degree. No other instruction on the issue of diminished capacity was warranted by the evidence, and thus there is no error.

Sovalik also claims that the concurrent life sentences he received are excessive. The trial court gave careful consideration to all the relevant sentencing factors.[8] In view of the enormity of Sovalik's crimes we cannot say that the court was clearly mistaken in imposing this sentence.

Finally, Sovalik contends that the court erred in failing to recommend mental health therapy as a part of the sentence. Such a recommendation would be advisory only. If psychiatric treatment is needed Sovalik has the right to receive it regardless of any recommendation made at the time of sentencing. *LaBarbara v. State*, 598 P.2d 947, 949 (Alaska 1979); *Rust v. State*, 582 P.2d 134, modified on rehearing 584 P.2d 38 (Alaska 1978). Under the particular circumstances of this case, we do not think

that it was an abuse of discretion not to recommend mental health therapy. Nor do we find that the sentence is excessive because of the failure to make such a recommendation.

AFFIRMED.

---

*denied*, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 393 (1978); *United States v. Keeble*, 459 F.2d 757, 762 (Supp.Op.) (8th Cir. 1972). Under present federal law delay in presentment is but one factor in the totality of circumstances to be given consideration. *Keeble, id.* Most state court cases reject a per se exclusionary rule where there has been unnecessary delay in bringing an accused before a magistrate. *See, e. g., Rogers v. Superior Court of Alameda County*, 46 Cal.2d 3, 291 P.2d 929 (1955); *State*

*v. Shipley*, 232 Or. 354, 375 P.2d 237 (1962); *State v. Hoffman*, 64 Wash.2d 445, 392 P.2d 237 (1964); Annot. 19 A.L.R.2d 1331, 1336 (1951). *Contra Webster v. State*, 213 A.2d 298 (Del.1965); *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977) (per se rule imposed after six hour delay).

8. *See State v. Chaney*, 477 P.2d 441 (Alaska 1970).