**Kristopher M. MARCY, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–2911.**

Court of Appeals of Alaska.

Dec. 20, 1991.

---

S. Joshua Berger, Fairbanks, for appellant.

William H. Hawley, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.[*]

## OPINION

ANDREWS, Judge.

Kristopher M. Marcy was convicted of first-degree murder, AS 11.41.100, first-degree sexual assault, AS 11.41.410(a)(1), and first-degree burglary, AS 11.46.300(a)(1). He was sentenced to a total of one hundred thirty-nine years for the current offenses and seven and one-half years of suspended time was reimposed on two cases in which

---

[*] Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

his probation was revoked.[1] His parole eligibility was restricted for ninety-seven years.

Marcy appeals his conviction on several grounds. First, he contends that the confession he gave on June 30 should have been suppressed because it was tainted by an involuntary confession which Marcy made on June 28. Second, Marcy claims that his sexual assault conviction must be reversed because the prosecution was unable to prove that the victim was alive when sexually penetrated. Third, Marcy argues that the sentencing judge was clearly mistaken in imposing one hundred forty-six and one-half years and restricting parole. Finally, Marcy asserts that the trial judge erred by summarily dismissing his application for post-conviction relief when it was apparent that the attorney representing Marcy on the application was ineffective. We affirm.

## I. FACTS

Fifty-nine-year-old S.K. was stabbed to death in the yard behind her trailer-home on June 12, 1988. She had been stabbed twenty-six times in her head, neck, and torso. She had ten additional knife wounds on her arms and hands that appeared to be inflicted while she attempted to defend herself. There was other physical evidence of a struggle.

Dr. Michael T. Propst, the doctor who performed the autopsy, concluded that S.K. had been sexually penetrated. Dr. Propst testified that S.K. could have lived as long as five minutes after receiving the stab wounds.

Trooper James M. McCann investigated the murder and concluded that the murderer had entered the trailer through a front window. The person who entered stepped on a stereo cabinet, on which McCann observed a footprint. After McCann photographed and measured the impression, he determined that the imprint on the stereo was made by an eleven-inch (size nine) Reebok tennis shoe.

The troopers discovered that on June 11, 1988, the night before the murder, Marcy went driving with Frank Heffle and Heffle's girlfriend, Daphne Evans. The three rode in Marcy's truck and were together until four or five the next morning, when Marcy left Heffle and Evans at Evans's residence. Marcy wore white Reebok sneakers while he was with Evans and Heffle. Heffle stated that Marcy always kept a six- or seven-inch folding knife with an inoperable lock in the truck. Heffle saw the knife for the last time shortly before the murder.

A few hours after Marcy left Heffle and Evans at home, Marcy telephoned the Evans residence. Evans answered the phone around 9:00 a.m. Marcy sounded excited. Evans gave the phone to Heffle and Marcy told Heffle he had just killed somebody.

During his one to one and one-half hour conversation with Heffle, Marcy described the murder in detail. He repeated that he had killed a lady because she had "pissed him off." He described the woman he had stabbed as in her sixties. He stated that he had stabbed her several times in the neck and chest and that one stab had caused profuse bleeding. He told Heffle he was covered in blood. He stated that he had left the victim on the back lawn outside the back door and that he had to hurry to leave S.K.'s residence because he knew that the victim's daughter planned to pick her up for church that morning. Marcy told Heffle that when he parked his truck by S.K.'s trailer "he kind of had a[n] idea of what he was going to do" and consequently he put on gloves and parked his truck away from the residence.

According to Heffle, Marcy claimed that he had found S.K. while she was hitchhiking in her bathrobe. He claimed that she led him to believe that they would have sex; however, S.K. refused to have sex with Marcy when they arrived at her residence and Marcy told Heffle that he "went off" and killed her.

Marcy told Heffle that he had disposed of the knife. He stated that he was naked

---

1. The two cases for which Marcy was on probation involved a conviction for burglary, case 4FA–S83–4261, and a conviction for third-degree assault, case 4FA–S85–1061.

because he was washing the clothes he had worn during the murder. He told Heffle that he had cut himself during the murder because the knife had closed and his fingernail was "sliced pretty good." Marcy asked Heffle not to tell anyone about the murder.

Heffle immediately told Evans about the conversation. Specifically, Heffle told Evans that Marcy claimed to have stabbed a woman about twenty-five times in the neck and the chest and that blood had spouted out of her body.

Heffle thought that Marcy might have lied about the murder. However, Heffle began to believe Marcy after a story about the murder appeared in the paper the next day. As they were riding in Marcy's truck, Heffle read the story. Marcy looked over at Heffle and said, "See, I told you." Heffle recognized the last name of the victim as that of Marcy's best friend. Marcy admitted to Heffle that the victim was his best friend's mother.

On June 18, Marcy and Heffle were riding in Marcy's truck when Marcy was arrested for driving under the influence. According to Heffle, Marcy was wearing his white Reebok shoes. The arresting officer photographed and measured the shoes. The sneakers were eleven-inches long.

After he left jail, Marcy told Heffle that he was worried because the police had examined his tennis shoes. Heffle told Marcy to throw them away. Marcy put his shoes in a sack, put the sack into the back of his truck, and later disposed of the shoes.

On June 21, McCann interviewed Marcy, who admitted that he knew S.K., but he claimed that he had not seen her for at least two and one-half years. McCann interviewed Marcy again on June 28. Marcy admitted that he had been in S.K.'s trailer to commit a burglary, but he denied sexually assaulting or murdering S.K.

Subsequently, on June 29, 1988, Marcy was arrested for the current offenses. When he was arrested, Marcy had a cut in the tip of his left index finger. He also had scratches on the front and rear of his right arm and on his left wrist. Marcy claimed that another person went into S.K.'s residence with him, implying that this other person might have murdered and assaulted S.K.

The day after his arrest Marcy sent a message from the jail indicating that he wanted to speak with McCann. McCann responded and Marcy gave a tape recorded interview. During the interview, Marcy admitted killing S.K. According to McCann, Marcy was scared, upset, and ashamed.

Marcy told McCann he remembered parking outside S.K.'s residence and going through the window into the living room of the trailer. He did not remember whether his knife was in his pocket or open. At the time he saw the victim in the first bedroom to the left, the blade of Marcy's knife was open. S.K. woke and saw Marcy as he was closing the door. Marcy told McCann that S.K. jumped out of bed, said something, and opened the door again. He stabbed her in the stomach and walked backward to the back door. S.K. followed saying, "Kris" and asking, "Why?"

Marcy said that he opened the back door of the trailer while S.K. continued to say, "Kris." Marcy started out the back door. S.K. tried to grab Marcy. Marcy stated, "Then I lose it, I don't know what I'm doing. I see red in my eyes. Like it's totally red. That's all I see." When his "eyes cleared" Marcy could see S.K. "laying there." Marcy recalled standing above S.K. and seeing blood "everywhere." He then ran to his truck.

Marcy claimed he did not know whether he had sex with S.K. He claimed that if he did, it happened outside. Later, however, Marcy said he knew he had been sexual with the victim, because his "mother said there was body fluids." He eventually remarked, "It had to have been outside cause I don't remember doing it inside." Marcy added that he did not know whether she was alive or dead when he had sex with her. Marcy claimed a general loss of memory. He stated that he only remembered the stab to the stomach and that he was wearing his Reebok tennis shoes. He did

not remember what he did with the knife or the clothing he had been wearing.

Chris W. Beheim, a criminalist and footwear expert, testified that the shoe print on the stereo cabinet in S.K.'s trailer and the cast taken of the shoe print in the driveway were similar to enlargements of the police pictures of Marcy's Reebok shoes. James Wolf, another criminalist, testified that the driver's side door and back wall of the cab in Marcy's truck reacted positively to presumptive tests for blood.

FBI agent Audrey G. Lynch testified that semen was present on the swabs taken from S.K.. Lynch claimed that the semen most likely came from a non-secretor. Non-secretors comprise about twenty percent of the population. Marcy was determined to be a non-secretor. Lynch also reported that human blood was found on a pair of jeans and a sock which were found in Marcy's truck. FBI agent Allyson Simons testified that hair found in S.K.'s right hand, on S.K.'s clothing, and on S.K.'s quilt matched hairs taken from Marcy.

The jury convicted Marcy of first-degree murder, first-degree sexual assault, and first-degree burglary.

## II. ADMISSIONS AND CONFESSIONS

Marcy made two confessions to police officers investigating the case. The first was made on June 28, 1988; the second on June 30, 1988. In his testimony, McCann referred to the June 28 confession in which Marcy admitted being in S.K.'s residence but denied the murder or sexual assault. The June 30, 1988, confession was played to the jury. Marcy claims that the first confession was involuntary and that it tainted the second confession. Consequently, he argues that both confessions should have been suppressed.

Marcy cites several reasons why his June 28 confession was involuntary. First, he claims that McCann admitted at trial that he had lied to Marcy to prompt him to confess. Specifically, he asserts that McCann lied to him about finding Marcy's fingerprints on S.K., observing Marcy's truck at S.K.'s residence, and using special lasers at the crime scene.[2]

McCann testified that he lied when he told Marcy that police officers had seen his truck at S.K.'s residence. McCann also testified that he created an illusion that the police had found Marcy's fingerprints, when in fact there were no identifiable prints but merely blood smears.[3] McCann never claimed that the police had used special lasers—he merely claimed that the police officers would use special lasers when investigating the crime.[4]

2. Marcy also claims that McCann lied to his mother, Kay Marcy. According to Ms. Marcy, McCann told her that they had found Marcy's fingerprints and body fluids at the scene, and some of S.K.'s belongings in Marcy's possession. At trial, McCann denied telling Marcy's mother that he had found items in Marcy's possession which had been taken from the victim's residence. In any event, Marcy does not explain how McCann's lies to his mother caused him to confess. He merely states that his mother visited him on June 29, 1988, and shortly after the visit he confessed to the murder. Given this record, McCann's alleged lies to Marcy's mother can not be deemed to have rendered Marcy's June 30 confession invalid.

3. The questions and answers regarding the fingerprints went as follows:

> Q [McCann]: Something happened. Something happened ah, Kris.
> A [Marcy]: Why.
> Q: We got your bloody prints on her leg, okay. Now I don't know what happened between you, she came at you, I don't know what the deal is ...
> A: My bloody prints, no, no.
> Q: (Inaudible) that's right buddy.
> A: No, no.
> Q: That's right buddy.
> A: No, no.
> Q: That's right.
> A: No, no.
> Q: That's right.
> A: No, uh'uh, uh'uh, no way, here take blood right now.
> Q: No.
> A: Go ahead take blood right now. That's not my blood, no, no.
> Q: I didn't say your blood, we'll find that from the semen.

4. The representation regarding the special lasers went as follows:

> Q [McCann]: Well, I, I'd just kind of like to know some confirmation of kind of ah, whether we're gonna be finding your stuff on the, you know ...
> A [Marcy]: No.

■ Marcy never asked the trial court to suppress either confession, although he claims that he urged his counsel to request suppression. According to case law, an admissible confession needs the following:

> [It] must be free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.

*Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897) (quoted in *Sovalik v. State,* 612 P.2d 1003, 1006 (Alaska 1980) and *Sprague v. State,* 590 P.2d 410, 413 n. 6 (Alaska 1979)). The circumstances which the court should consider when determining the voluntariness of a confession are:

> [T]he age, mentality and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.

*Sovalik,* 612 P.2d at 1006 and *Sprague,* 590 P.2d at 414 (quoting *Brown v. United States,* 356 F.2d 230, 232 (10th Cir.1966)).

In *Sovalik,* the Alaska Supreme Court held that Sovalik's confession was voluntary even though the authorities had lied when they told him that his fingerprint had been found on a bottle at the crime scene. 612 P.2d at 1007. The court reasoned that "this artifice was not coercive and [was] not one which would have a tendency to produce an untruthful confession." *Id.* Furthermore, the court stated that trickery in obtaining a confession is only one factor in determining whether the confession was voluntary. *Id.* at n. 4. The court noted trickery alone does not render a confession inadmissible and most authorities hold that confessions which result from trickery are admissible so long as the tricks would not tend to produce an untruthful confession. *Id.* at n. 4 (citing Annot. 99 A.L.R.2d 772, 783 (1965)).

Q: ... we search everything with magnifying glasses and everything ...
A: Yeah, well, (inaudible) probably do, you know.

■ In the present case, Marcy's failure to object below to the admission of his statements on the grounds of voluntariness deprived the superior court of the opportunity to conduct an evidentiary hearing to determine the totality of the circumstances surrounding the making of the challenged statements. It is impossible to predict what additional evidence the state may have presented on the voluntariness issue had it been raised. Moreover, there is no way of determining whether Marcy's trial counsel deliberately elected not to challenge the admissibility of the statements. Marcy's claim that he had blacked out and remembered nothing about the stabbing enabled him to argue that he did not intentionally kill his victim and was at most guilty of second-degree murder. Because this claim was set forth in the disputed statements, trial counsel may have decided to forego claiming that the statements were involuntary.

Under the circumstances, there is a strong argument that Marcy's failure to raise the voluntariness issue in a timely manner amounts to a forfeiture and precludes further consideration of the issue except in a post conviction relief proceeding, upon a showing of cause and prejudice. *See, e.g., Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Moreau v. State,* 588 P.2d 275, 280 (Alaska 1978). In any event, Marcy is at most entitled to review for plain error at this stage. On the current record, we hold that the trial court did not commit plain error by failing to suppress the challenged statements *sua sponte.*

### III. SEXUAL ASSAULT CONVICTION

■ The sexual assault offense was charged and presented in the alternative: the jury was told that it could convict Marcy if he sexually penetrated S.K. without her consent, or if he caused serious injury by attempting to sexually penetrate S.K. The jury answered an interrogatory indi-

Q: ... special lasers. Yeah.
A: You know, I got some idea what you guys do, what you guys got to do with, you know.

cating that they unanimously agreed that Marcy had penetrated S.K. without her consent. The jury did not answer the next interrogatory which asked whether Marcy had only attempted to penetrate S.K.

Marcy argues that a conviction under AS 11.41.410(a)(1) requires proof that the defendant sexually penetrated a live victim.[5] He claims that if the evidence does not establish that the victim was alive, the crime is not rape, but rather the misdemeanor offense of misconduct involving a corpse. Marcy argues that the evidence was insufficient to find that S.K. was alive when penetrated.

When reviewing whether sufficient evidence was offered to sustain a conviction this court "will consider only those facts in the record most favorable to the prosecution and such reasonable inferences as a jury may have drawn from them." *Dorman v. State*, 622 P.2d 448, 453 (Alaska 1981) (quoting *Martin v. City of Fairbanks*, 456 P.2d 462, 464 (Alaska 1969)).

Regardless of whether this statute requires a live victim, a question we do not decide, the state presented sufficient evidence to allow the jurors to conclude that S.K. was alive at the moment of penetration.

Dr. Propst testified that S.K. could have lived as long as five minutes. Marcy told Heffle that he "lost it" and killed S.K. because she refused to have sex with him. The jury could reasonably infer that if Marcy's primary goal was to have sex with S.K., he would not wait long to penetrate her after rendering her defenseless. In addition, Marcy told Heffle that his clothing was "soaked" with blood. Since the blood was not dry when Marcy reached his home, it is reasonable to infer that the stabbings, the penetration, and Marcy's drive home took place within a relatively short period of time. Furthermore, there was other physical evidence concerning the position of the victim's legs and the onset of rigor mortis from which the jury could have reasonably inferred that Marcy sexually penetrated S.K. before she died. *See State v. Holt*, 128 Wis.2d 110, 382 N.W.2d 679, 685 (App.1985) (under circumstances similar to those in the current case the court held that in a rape-murder case where the exact sequence of events cannot be proved, the jury may reasonably infer ... that the victim was alive during the sexual assault).

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Marcy argues that Judge Hodges erred by summarily denying his application for post-conviction relief, based on an ineffective assistance of counsel claim, because it was apparent that Marcy's post-conviction attorney was also ineffective. Specifically, Marcy contends that his attorney was obviously ineffective because he failed to respond to the state's motion to dismiss and the court's notice of intent to dismiss. The court ultimately dismissed the case because Marcy, by failing to respond, did not establish a *prima facie* case of ineffective assistance of counsel.

The trial court did not abuse its discretion by dismissing the application. Marcy's counsel's failure to respond to the state's opposition and the court's notice, by itself, does not establish that he was ineffective. It is possible that counsel chose not to respond because Marcy could not make out a *prima facie* case of ineffective assistance. Furthermore, even if the dismissal of his post-conviction application was due to attorney incompetence, Marcy has failed to show that the dismissal has prejudiced him. He has not shown that the court would not consider the ineffectiveness claim in a second application. The trial court did not abuse its discretion by

---

5. At the time of these offenses, AS 11.41.410(a)(1) and (2) stated that:
  A person commits the crime of sexual assault in the first degree if,
  (1) being any age, the defendant engages in sexual penetration with another person without consent of that person;

  (2) being any age, the defendant attempts to engage in sexual penetration with another person without consent of that person and causes serious physical injury to that person....

denying Marcy's application for post-conviction relief.

## V. SENTENCE CLAIM

Marcy received consecutive sentences of ninety-nine years for his murder conviction, ten years for his burglary conviction, and thirty years for his sexual assault conviction. His probation was revoked on two earlier cases, and seven and one-half years were imposed. Judge Hodges thus sentenced Marcy to a total of one hundred forty-six and one-half years. He restricted Marcy's parole for ninety-seven years.

Marcy claims that his sentence and parole restriction are clearly mistaken. He argues that a sentencing court may not impose consecutive sentences of more than ninety-nine years and restrict parole unless it has found that the defendant will pose a danger to society during his or her entire life. Finally, he asserts that Judge Hodges's finding that Marcy was not amenable to treatment was mistaken since he did not review a current psychological or psychiatric evaluation.

### A. The Offender

Marcy was twenty-three years old when sentenced. He had an extensive criminal record. As a juvenile, he was charged with minor in possession, theft, and unlawful entry to commit theft. He was adjudicated delinquent on the unlawful entry charge. While on probation for the unlawful entry charge, he was charged with joyriding and a petition to revoke was filed alleging two probation violations because two of his urine samples tested positive for marijuana. The hearing on the petition to revoke was continued until the day before Marcy's eighteenth birthday. At the hearing on June 17, 1983, a probation officer testified that Marcy was not amenable to probation as an adult.

In 1984, Marcy, as an adult, was convicted of first-degree burglary. He received a suspended sentence and probation. In June 1984, his probation was revoked because he unlawfully used his parents' checks. In October, only four months after this probation revocation, Marcy failed to appear in court on a reckless driving charge and was ordered to serve nine days. In December 1984, Marcy was convicted of shoplifting and failure to appear on a traffic charge. In February 1985, Marcy was convicted of failure to show an operator's license, failure to stop, minor in possession and consuming alcohol, minor on premises, failure to pay a fine, failure to appear at arraignment, and failure to appear on the minor in possession charge. One month later, in March 1985, Marcy's suspended sentence on the first-degree burglary charge was revoked, and Marcy was sentenced to five years with four and one-half years suspended. While serving this six-month sentence, Marcy was charged with and convicted of third-degree assault and first-degree weapons misconduct. Consequently, Marcy was sentenced to three years on the assault charge, and three years suspended on the weapons misconduct charge. Marcy was released from incarceration on May 9, 1988, and a little more than one month later, on June 12, he committed the current offenses. On June 18, 1988, Marcy was arrested for driving under the influence (DUI). He was convicted of DUI in December 1988.

Judge Hodges reviewed Marcy's criminal record and remarked:

> [The] [c]ourt must take into account the probability of successful rehabilitation of Mr. Marcy into a non-criminal and non-offending member of society. Mr. Marcy's past record indicates that his lack of—that he has a total lack of rehabilitative potential. He first became involved in the criminal justice system as a juvenile; had a record as a juvenile. Shortly after release from juvenile probation, juvenile authorities, was involved in a felony burglary. Not long after, and while on probation, with respect to the burglary offense, became involved with an assault as well as a misconduct involving weapons in the first degree. . . . Upon completion of that sentence, within weeks of his release from custody and on probation, he committed this offense. Mr. Marcy has served a relatively substantial period of time in custody. He's

been involved in two separate cases—two separate occasions with the criminal justice system for felonies. He's had probation revocations; in addition, he has a substantial misdemeanor record. This indicates he's an habitual criminal, · a worst offender in light of his prior record alone. With respect to this offense, as the court has determined, it's the worst with respect to these type[s] of offenses. There's an absolute necessity to isolate Mr. Marcy from society so that he will conform his conduct to acceptable standards. His past record shows that he's not amenable to treatment. With[in] relatively short periods of time of his release from probation/parole/incarceration or while on probation, he engages in criminal conduct. In addition to the substantial crimes which he committed in this offense—in this case, while on probation, he was involved with operating a motor vehicle while under the influence. None of which speaks well for his rehabilitative potential. As the court mentioned, it's necessary to isolate him so it will conform his conduct. Mr. Marcy is a dangerous person. There's no sentence other than incarceration which will deter Mr. Marcy from criminal conduct. It's been proven in the past, and he's demonstrated to this court as well as to society as a whole, that unless he's incarcerated he will continue to commit criminal offenses.... In this case the court places emphasis on reaffirming societal norm—norms, deterring others and isolating Mr. Marcy. As the court mentioned, it's hard to imagine [a] more serious burglary, [a] more serious sexual assault. There certainly may be, but when you reach a certain level, whether they're more serious, more aggravated or not, is of no consequence to the maximum penalty that should be imposed. As the court indicated, Mr. Marcy is the worst offender within the class sexual assault in the first degree, burglary in the first degree. He can be characterized as a worst offender in light of his prior record, in light of the time that he's spent incarcerated. It's his third felony conviction for purpose of [a] presumptive sentence. His current attitude and progress, in terms of rehabilitation, is non-existent.· Anyone who is released from custody and within weeks of the time, commits this type of offense is not amenable to treatment. This offense is serious, among the most serious as the court has found. Mr. Marcy's a dangerous offender. This court feels, under those circumstances and for the reasons set forth, that a maximum sentence should be imposed to insure that Mr. Marcy remains behind bars.... [The] [c]ourt feels that it's absolutely necessary to incarcerate Mr. Marcy so that he is not released from custody, to insure the safety of the public, so that Mr. Marcy will not commit any other offenses.

## B. The Offense

Judge Hodges found several aggravators. Under AS 12.55.155(c)(1), (4), and (10), he found that the sexual assault and burglary charges were aggravated by three factors:

1) someone other than an accomplice sustained injury;

2) Marcy employed a dangerous instrument; and

3) the offenses were among the most serious in their class.

The convictions in general were aggravated because according to AS 12.55.155(c)(5), (2), (15) and (20):

1) The victim was particularly vulnerable;

2) Marcy evinced deliberate cruelty;

3) The defendant had been convicted of three of more prior felonies;

4) The defendant was on probation or parole at the time the current offenses were committed.

The burglary conviction was aggravated because the defendant had committed offenses similar to the burglary charge. AS 12.55.155(c)(21). Marcy has not claimed that the court erred by finding these aggravators.

## C. Discussion

### 1. *Consecutive Sentences and Parole Restriction*

█ Marcy asserts that a sentence which exceeds ninety-nine years can only be justified if the court finds it necessary to imprison the defendant for life. Marcy claims that the record did not show that he would be a danger to society after serving ninety-nine years. Consequently, he argues that imposing consecutive sentences and a parole restriction was improper.

Marcy's claim that consecutive sentences were unjustified lacks merit. Marcy argues that *Page v. State*, 657 P.2d 850, 854 (Alaska App.1983), supports his position. Page received a ninety-nine year sentence on a second-degree murder charge and a consecutive twenty-year sentence on a first-degree robbery conviction. *Id.* at 855. This court held that the consecutive sentences were not justified since "nothing in the record supports a finding that Page will continue to be a danger after the expiration of ninety-nine years." *Id.* We held consecutive sentences were not warranted even though the record showed that Page lacked any remorse for the brutal murder which involved multiple stab wounds. *Id.* at 854–55. Furthermore, Page had an extensive criminal record. He had failed to benefit from past probationary supervision, and had failed to address his drug problems in a court-assigned drug rehabilitation unit. *Id.* We noted, however, that Page's past crimes did not involve injury to persons. *Id. See also Ridgely v. State*, 739 P.2d 1299, 1303 (Alaska App.1987) (court improperly imposed burglary and theft sentences consecutive to murder sentence since the offenders were youthful and had not previously committed violent crimes).

Page, however, is distinguishable from Marcy. Page was convicted of second-degree murder and Page's previous offenses did not involve injury to people. Conversely, Marcy had previously been convicted of assault and weapons misconduct. In addition, the nature of Page's crimes differ from Marcy's crimes, indicating that Marcy poses more of a threat to society. Page's testimony suggested that he killed his victim in response to provocation. Marcy, however, stalked his best-friend's mother. He planned to commit his crime when he knew the victim would be alone and most vulnerable. S.K. pleaded with Marcy and attempted to escape, but Marcy continued his brutal assault.

In *Nukapigak v. State*, 663 P.2d 943, 946 (Alaska 1983), the court affirmed three consecutive ninety-nine year sentences for the first-degree murder of three victims. The court noted that consecutive sentences had generally been approved where the offender harmed more than one victim. *Id.* at 945. The court upheld the consecutive sentences noting the heinous nature of the crimes and a record devoid of any hope for rehabilitation. *Id.* at 946. Furthermore, Nukapigak had prior convictions for assaulting his wife and for raping and assaulting another woman. *Id.*

In *Krukoff v. State*, 702 P.2d 664 (Alaska App.1985), this court upheld two consecutive sentences of ninety-nine years for two counts of first-degree murder. We recognized that Krukoff's criminal record involved several felony and misdemeanor assaults. *Id.* at 666. In addition, Krukoff failed to benefit from five years of incarceration and participation in an alcohol treatment program. *Id.*

Although Nukapigak murdered three people, and Krukoff murdered two victims, the supreme court and this court did not state that consecutive sentences were permissible only because the defendants had killed more than one person. Rather, consecutive sentences were imposed because "there was no way of assuming that society would ever be safe if [the defendants] were released from prison." *Nukapigak*, 663 P.2d at 945–46; *Krukoff*, 702 P.2d at 666. *See Weitz v. State*, 794 P.2d 952, 958 (Alaska App.1990) (consecutive sentences exceeding ninety-nine years may be imposed even though defendant did not murder multiple victims).

The sentencing judge could have properly concluded that Marcy, like Nukapigak and Krukoff, is a defendant from whom society may never be safe if released from custody. Marcy committed these heinous

offenses within a few weeks of being paroled. When not incarcerated, Marcy repeatedly committed crimes, and violated probation and parole conditions. His offenses continually increased in severity. At sentencing, he denied the murder and sexual assault. Given the nature of Marcy's current offenses, and his abysmal failure to conform his conduct to societal norms, for even a short period of time, Judge Hodges' imposition of consecutive sentences was not clearly mistaken.

■ Similarly, the parole restriction was not clearly mistaken. As noted, the court could properly assume that Marcy would remain a danger to society throughout his life. *See Weitz v. State,* 794 P.2d 952, 953 (Alaska App.1990) (sentence of one hundred sixty-nine years with no eligibility for parole not clearly mistaken for defendant convicted of first-degree murder, first-degree robbery, third-degree assault, first-degree weapons misconduct, and two counts of attempted first-degree murder); *Newell v. State,* 771 P.2d 873, 876–77 (Alaska App.1989).

### 2. *Absence of Psychological Report*

Marcy argues that Judge Hodges should not have restricted his parole without relying on a psychiatric or psychological report.

■ Generally, the trial court should not enhance a sentence based upon a finding that the defendant demonstrated an antisocial nature or dangerous propensities without the aid of a psychiatric or psychological evaluation of the defendant. *Pruett v. State,* 742 P.2d 257, 260 n. 3 (Alaska App.1987); *Salud v. State,* 630 P.2d 1008, 1013–14 (Alaska App.1981). *See also Tommy v. State,* 551 P.2d 179, 180 (Alaska 1976) (court should not have sentenced a twenty-three-year-old without the aid of a current psychiatric report, when a four-year-old presentence report indicated that the defendant needed psychiatric help). However, when the record does not reflect a defense request for such an evaluation

prior to sentencing, and the defendant fails on appeal to indicate how such an evaluation could have benefitted him at sentencing, the trial court's sentence is properly imposed without the evaluation. *Spencer v. State,* 642 P.2d 1371, 1376 (Alaska App. 1982). *See also Brown v. State,* 578 P.2d 982, 984 (Alaska 1978) (court could impose sentence without recent psychological report since defendant failed to show that a recent report would differ from a report made three years before the commission of the current offense).

> [W]hile this court has recognized the importance of psychological and psychiatric data as an aid in arriving at sentences which further the goals of penal administration, we have also held that such evaluations are not indispensable or necessary in every case, and that the absence of a psychiatric evaluation does not necessarily require us to set aside a sentence.

*Walton v. State,* 568 P.2d 981, 984 (Alaska 1977) (citing *Adams v. State,* 521 P.2d 516, 518–19 (Alaska 1974)). Thus, when a sentence is justified by a defendant's criminal record and personal background, it is not mistaken, even if it is made without the benefit of a psychological examination. *Horton v. State,* 570 P.2d 482, 483 (Alaska 1977). This is particularly true when the defense has not suggested that the defendant suffers from a "treatable mental illness or that such a mental illness influenced his criminal activity." *Spencer,* 642 P.2d at 1377 n. 5.

In the current case, an unidentified speaker noted that the court was imposing the sentence without a psychological or psychiatric report. The defense, however, never objected to the court's imposition of a sentence without such a report. Furthermore, Marcy has not indicated how a report could have benefitted him at sentencing.[6] He has never suggested that he suffers from a treatable disease which caused him to commit the crime. In fact, Marcy denied

---

**6.** We note that the defendant has the right not to submit to a psychological or psychiatric exam. *R.H. v. State,* 777 P.2d 204 (Alaska App. 1989). There is nothing in this case to suggest that the absence of a psychological exam was anything other than an affirmative tactical decision on defense counsel's part.

committing these offenses at sentencing. Consequently, the court was not mistaken in imposing the sentence, including the parole restriction, by relying on Marcy's criminal record and personal background.

## VI. CONCLUSION

The court did not err by admitting Marcy's June 30 confession into evidence. The evidence was sufficient to find that S.K. was alive when penetrated. The court did not abuse its discretion by dismissing Marcy's application for post-conviction relief. The sentence and parole restriction are not mistaken. We AFFIRM.