George E. COLE, Appellant,

v.

STATE of Alaska, Appellee.

No. A–5532.

Court of Appeals of Alaska.

Sept. 20, 1996.

---

Donna J. McCready, Assistant Public Advocate, and Brant G. McGee, Public Advocate, Anchorage, for Appellant.

Cynthia L. Herren, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

George E. Cole appeals his conviction for second-degree sexual abuse of a minor, AS 11.41.436(a)(3), contending that a statement he gave to the police was involuntary and should have been suppressed. We reverse.

## FACTS

On October 11, 1993, Seward Police Officer Todd McGillivray received information that Cole had sexually abused C.C., Cole's sixteen-year-old adopted daughter. Upon being interviewed at the police station, C.C. confirmed the report.

C.C. told McGillivray that in September of 1993 her father (Cole) caught her smoking. Cole offered C.C. a deal: C.C. could continue to smoke if she would let him teach her "the ways of the Ninja." C.C. agreed to the deal. Cole told her not to discuss the Ninja training with anyone, including her mother. At first, the training consisted of ordinary calisthenics such as sit-ups, leg bends, and the like. However, after the first "session," Cole insisted that C.C. exercise in only her underwear. On October 10, 1993, Cole instructed C.C. to completely disrobe for the Ninja training. Cole was also nude during this session; at some point, acting on the pretext of checking C.C.'s muscular development, he lifted up her breasts with his hands. C.C. asked Cole to stop touching her, and he did. Cole then asked C.C. to touch him, but she refused. The next day, C.C. reported the incident to the mother of one of her friends, who, in turn, notified the police.

While C.C. was describing the incident to McGillivray, Cole called the police station to report C.C. as a runaway. That evening, Cole called again, and spoke to the police dispatcher, saying that he had located his daughter and had heard that she was accusing him of molesting her. The dispatcher notified McGillivray, who asked the dispatcher to have Cole meet him at the police station, ostensibly to file a runaway report. Cole soon arrived at the station and met with McGillivray.

McGillivray led Cole to an interview room and informed Cole that he was not in custody

and would not be arrested. A seventy-minute tape-recorded interrogation ensued, during which McGillivray employed a variety of deceptive tactics: he threatened Cole with a court-ordered polygraph, he falsely claimed that the police had obtained incriminating evidence pursuant to an electronic surveillance warrant, and he gave Cole repeated assurances that the purpose of the interrogation was to get help for Cole and/or his family.

Cole initially maintained his innocence. Eventually, he admitted that he needed psychological help and that he had made a "deal" to teach C.C. "the ways of the Ninja." As the interrogation progressed, Cole admitted touching C.C. but claimed that his conduct was innocent—an integral part of the Ninja training. And ultimately, he admitted that he had touched C.C. for his own sexual pleasure.

The state introduced Cole's confession before the grand jury, which issued an indictment charging Cole with second-degree sexual abuse of a minor. Prior to trial, Cole filed motions to dismiss his indictment and to suppress his confession, claiming that the confession was involuntary. After reviewing the tape-recorded interrogation,[1] Superior Court Judge Charles K. Cranston denied Cole's motions, concluding that Cole had confessed voluntarily. Cole's confession was admitted against him at trial, and he was convicted of sexual abuse in the second degree.

## COLE'S CLAIM OF INVOLUNTARINESS

On appeal, Cole contends, as he did below, that his confession was involuntary. Cole claims that the circumstances surrounding his interrogation created an atmosphere of intimidation. More fundamentally, Cole focuses his claim on McGillivray's deceptive interrogation techniques. Viewing these techniques against the generally coercive backdrop of his interrogation, Cole maintains that the totality of the circumstances pre-

cludes a finding of voluntariness and establishes that the trial court erred in denying his motions to suppress and dismiss.

## THE VOLUNTARINESS REQUIREMENT

A confession is inadmissible unless it is voluntary. *Sprague v. State,* 590 P.2d 410, 413 (Alaska 1979); *accord Greenwald v. Wisconsin,* 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968); *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). The state bears the burden of proving the voluntariness of a confession by a preponderance of the evidence. *State v. Ridgely,* 732 P.2d 550, 554–55 (Alaska 1987). To be voluntary, a confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Sovalik v. State,* 612 P.2d 1003, 1006 (Alaska 1980) (quoting *Bram,* 168 U.S. at 542–43, 18 S.Ct. at 187). "The [United States] Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement was such as to overbear [the defendant's] will to resist and bring about confessions not freely self determined." *Stobaugh v. State,* 614 P.2d 767, 772 (Alaska 1980) (quoting *United States v. Ferrara,* 377 F.2d 16, 17 (2nd Cir.1967)).

The United States Supreme Court has also made clear that police coercion does not always take the form of physical beatings or threats—"that the blood of the accused is not the only hallmark of an unconstitutional inquisition ... that the efficiency of the rack and the thumb screw can be matched ... by more sophisticated modes of 'persuasion.'" *Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960).

The ultimate issue is "whether the State has obtained the confession in a manner that comports with due process." *Miller v. Fen-*

---

1. Neither Cole nor the state requested an evidentiary hearing, and Judge Cranston denied Cole's request for oral argument on the suppression motion. Apart from the transcript of the interrogation, the only documentary evidence appended to the pleadings submitted by the parties in connection with the suppression motion was a computer printout confirming Cole's claim that he had no prior exposure to the criminal justice system. The state did not dispute that claim.

*ton,* 474 U.S. 104, 110, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985).

> In psychological coercion cases, we must consider the totality of the circumstances involved and their effect upon the will of the defendant. The pivotal question in each case is whether the defendant's will was overborne when the defendant confessed.

*United States v. Miller,* 984 F.2d 1028, 1031 (9th Cir.1993) (citations omitted).

## THE APPLICABLE STANDARD OF REVIEW

Appellate review of a trial court's finding of voluntariness presents a mixed question of law and fact, triggering a three-step inquiry that involves a dual standard of review:

> When an appellate court reviews a trial judge's determination of voluntariness, its standard of review reflects the mixed factual and legal nature of the voluntariness inquiry. The voluntariness inquiry involves three steps. First, the trial judge must find the external, phenomenological facts surrounding the confession. Second, from these external facts, the judge must infer an internal, psychological fact: the mental state of the accused. Finally, the judge must assess the legal significance of this inferred mental state. *Troyer v. State,* 614 P.2d 313, 318 (Alaska 1980), quoting *United States v. Brown,* 557 F.2d 541, 547–48 (6th Cir.1977).

> The first step of the inquiry, determining historical fact, is a pure fact-finding task requiring weighing the credibility of witnesses. Therefore, the appellate court must defer to the trial judge's findings of historical fact and overturn them only if they are clearly erroneous. However, the appellate court has a duty to examine the entire record and make its own independent determinations as to the mental state of the accused and its legal significance. These determinations are to be based on the totality of the circumstances surrounding the confession. *Troyer,* 614 P.2d at 318.

*State v. Ridgely,* 732 P.2d 550, 554 (Alaska 1987); *see also Johnson v. State,* 631 P.2d 508, 510–12 (Alaska App.1981).

The present case comes to us on undisputed facts: Judge Cranston heard no testimony and decided the voluntariness of Cole's confession based on his review of the tape-recorded interrogation. Because the facts are undisputed and the only questions raised on appeal relate to the second and third steps of the voluntariness inquiry, this court must exercise its "duty to examine the entire record and make its own independent determinations." *Ridgely,* 732 P.2d at 554.

## COLE'S INTERROGATION

Cole's claim of involuntariness requires us to describe his interrogation in some detail.

As we have already stated, McGillivray met Cole at the Seward police station on the evening of October 11, 1993, on the pretext of taking Cole's report that C.C. had run away from home. In actuality, McGillivray planned to interrogate Cole about C.C.'s report that Cole had sexually touched her on October 10.

The interview began at approximately 9:30 p.m. and continued for seventy-two minutes. At the outset, McGillivray twice assured Cole that "no matter what we talk about here tonight, you will not be arrested." After listening to Cole explain why he had reported C.C. as a runaway, McGillivray assured Cole that C.C. was safe; McGillivray said he had spoken with C.C. earlier that night and that she was presently a ward of the state.

McGillivray then informed Cole that "we're going to talk about ... some accusations that she made to me," and that "this is serious." McGillivray told Cole that "it's very important that you're completely honest with me[.]" He explained that complete honesty was important "because if there is a problem, whether it's on your side or her side, our main objective is to get help for whoever needs it and get the problem solved." McGillivray reassured Cole that it was this desire to help that enabled him to promise that Cole would not be arrested: "That's why I want to set you at ease that no matter what we talk about tonight, you're free to leave here tonight. Ok? I mean, it's very important that you understand that." McGillivray repeated that he was motivated solely by the

desire to provide help: "Like I say, our objective is to just, you know, we need to get help for whoever needs it. Ok?" Cole responded, "Ok."

This explanation brought McGillivray to his formal interrogation. He asked Cole a series of general questions about the background circumstances C.C. had reported. Gradually, McGillivray focused on C.C.'s report of the sexual touching itself. Cole consistently denied knowledge and involvement in any of the kinds of conduct C.C. had reported. McGillivray ultimately asked, point blank, "have you ever had any sexual contact with your daughter?" Cole responded, "No, absolutely not."

At this point, McGillivray abruptly shifted course. He falsely told Cole that the police had been involved in investigating C.C.'s report of abuse for "[a] week or so," that "we've known this for awhile," and that "[t]his just isn't something that cropped up tonight." He then began to talk about a polygraph test, saying, again falsely, that the district attorney had authorized the police to give Cole a polygraph examination.[2] After making sure that Cole knew what a polygraph examination was, McGillivray asked if Cole was willing to submit to one. When

Cole expressed his distrust of lie detector tests, McGillivray falsely proclaimed that he had extensive experience with such tests, that he had never known the tests to be inaccurate, and that he was prepared to obtain a court order requiring Cole to submit to polygraph questioning.[3]

McGillivray made no effort to actually arrange a polygraph test. Saying that he wanted to avoid wasting time on a test if Cole would simply fail it, and reminding Cole that his objective was to get help for Cole and his family as soon as possible, McGillivray declared that he needed to know immediately whether Cole would fail.[4] Cole answered that he did not think a test would be a waste of time and that, although he was still "scared of the machines," he was willing to take a test, "if you're going to get a court order and all this stuff[.]"

But McGillivray immediately deflected Cole away from an actual test and steered him into a series of hypothetical polygraph questions about the sexual touching incident. As to each hypothetical question, McGillivray asked Cole tell him how Cole would respond when the polygraph examiner asked the question and what Cole thought the polygraph machine would reveal about the truth-

2.  (OM): Uh, I've talked to the District Attorney on it. Uh, one thing that we do have at our disposal that, that they're to spend the money on and that is, that is real helpful to both you and me ... is what they call a polygraph examination.

3.  (OM): Ok. Would you be willing to take a polygraph examination [in] reference to these allegations?
(GC): Um I, I don't know at this time. I don't ...
(OM): And why would that be?
(GC): I, I'm scared of them.
(OM): Why is that?
(GC): I don't know. I've seen so many things on TV where [they] had these lie detectors ...
(OM): Well ... I'll tell you right now ... I've dealt with polygraphs a lot over the last couple of years. Ok ... I find them to be very helpful and very accurate. Ok. I've never had one false positive and I've never had one negative. Ok. And I've had a lot of people through polygraphs ... if you know going in that you're going to pass the polygraph, you will pass the polygraph.
(GC): Yeah.

(OM): Ok. If there is nothing there. If not I need to know about it now. Ok?
(GC): Ok. What will happen[?]
(OM): Because we will, we will do a polygraph. Ok?
(GC): By a court order?
(OM): Well if I have to.

4.  (OM): ... What I need to know is whether or not it will be ... a waste of my time.
(GC): What do you mean a waste of your time?
(OM): Well, if, if you know going in there that you're going to fail this polygraph. I need to know about [it] now. Ok? That's what I'm talking about. And I would rather us for the sake of your daughter and for the sake of you and your family, get this problem worked [out] tonight if we have a problem. You know, if we need to get some help in the family, that's what we need to do tonight because personally I think there's a problem at home.
(GC): Ok.
(OM): And I think a polygraph right now would be a waste of my time.
(GC): Ok.
(OM): Ok? ... I mean, do you agree with me there?

fulness of his answer.[5]

As McGillivray pressed on with the mock polygraph interrogation, he alternated between accusations of dishonesty and assurances that he just wanted to "get help for the right person." [6] Cole steadfastly denied ever touching C.C.'s breasts or exercising with her while she was in only her underwear.

·Eventually it became clear that the mock polygraph technique was fruitless; McGillivray turned to a new tactic by confronting Cole with evidence that did not actually exist. McGillivray falsely informed Cole that the police had already obtained a *"Glass"* [7] warrant authorizing electronic monitoring of Cole's home and that, pursuant to the warrant, they had recorded the previous night's "exercise" session with C.C. McGillivray demanded to know what Cole had to say in light of this revelation.[8]

Cole's resistance cracked: he told McGillivray, "I need help." He then specified that the help he needed was "mental." McGillivray pursued this opening and pressed Cole for details, emphasizing that the "only reason" he wanted to hear the details was "so we know which kind of help we need to will get to the truth. And if I have to go digging to get to the truth, and I do find out that, you know, you weren't telling me everything that you could have tonight, it's not gonna look real good. Can you understand that? Don't you think that it would look better if you were honest with me from the get go then …

---

5. For example:

> (OM): … One of the questions is going to be: have you ever exercised with your daughter while she's been in her underwear?
> (GC): Ok. ,
> (OM): How would you answer that question?
> (GC): Uh, I, uh, given a statement and I, I'm confused.
> (OM): Well I'm not trying to confuse you, sir. I'm, I'm trying to …
> (GC): You're trying, you're trying to say that, that I did this.
> (OM): Well, I'm tryin' to find out whether you did or you didn't[.]
> ….
> (OM): [H]ow do you think the polygraph would say?
> (GC): I don't know. Because I'm scared of 'em.
> (OM): Okay, well, in your own mind, how would you say the polygraph would say that (both talking)
> (GC): I don't, I don't want to speculate. Please? I really don't want to speculate, because, I don't know what that machine w' say.
> (OM): Well, if you're truthful, the machine would say you're truthful. If you're not, the machine's gonna say that you're not truthful, that you're being deceptive.
> (GC): Okay.
> (OM): If a polygraph examiner ever asked you if you've ever touched your daughter's breast, how would you answer that question?
> (GC): No! My God! What is going on here?
> (OM): What do you think the polygraph would say when you answered that question?
> (GC): I, again, I don't know.
> (OM): Well, Mr. Cole, I, I'm gonna answer those questions for you.
> (GC): Okay.
> (OM): Okay? On the answer to both those questions, I think you would fail the polygraph.

6. McGillivray also suggested that confessing would make things easier on Cole and that failure to confess might be held against him:

> (OM): … it's just gonna be easier on the both of us, and I think would look better for you too, if you were truthful with me. Because I

(GC): But I have been honest with you from the get go! Why, why …
(OM): Are you sure?
(GC): Yes, I'm sure.

7. *State v. Glass*, 583 P.2d 872 (Alaska 1978) (requiring, under the Alaska Constitution, that the police obtain a warrant before engaging in surreptitious electronic monitoring or recording of conversations without the consent of both parties).

8. (OM): … If, if I told you that your daughter came to me with this days ago, what would you say?
> (GC): I don't know. I'm just shocked. I'm surprised.
> (OM): What would you say if I had a *Glass* warrant.
> . (GC): A what?
> (OM): W', a *Glass* warrant, which is an electronic surveillance warrant, which means I can record another person's conversations, without them knowing it.
> (GC): Uh huh.
> (OM): What would you say if I had one of those in my possession right now? To record the conversations of you?
> (GC): Do you?
> (OM): Now do you think I would bring it up if I didn't?
> (GC): I don't know. I'm just asking.
> (OM): And what would you say if I had this electronic surveillance device in your home last night when you and your daughter exercised?
> (GC): Did you?
> (OM): Would I know about it if I didn't? Last night she wasn't even wearing clothes. Because you changed the deal on her.

get."[9] But despite persistent questioning, Cole was reluctant to reveal more.

Faced with Cole's reluctance, McGillivray insisted that Cole would get no help unless he told McGillivray "what happened with your daughter."[10] Upon hearing this, Cole acknowledged making a deal to teach C.C. "the ways of the Ninja" but declined to divulge what this entailed, professing a "code of silence."

Under McGillivray's persistent interrogation, however, Cole gradually began to reveal more information. He admitted that he had exercised with C.C. while she was nude, and had touched her breasts.

But Cole continued to deny that sexual intercourse was the "final goal" of the Ninja training. When asked to explain why he had touched C.C., Cole said that it "was ... to help her overcome the fear of being touched." Cole also admitted that he had

told C.C. "she had the freedom" to touch him during the sessions "if she wanted to."

Cole still insisted that this conduct was integral to "Ninja training." McGillivray pressed for details about the Ninja "code of silence," but Cole said he was fearful that the tape of his interview with McGillivray would be played publicly, in "a public courtroom, an' stuff like that." McGillivray falsely assured Cole, "that won't happen" and that "[t]hese type of cases are very confidential."

Upon receiving these assurances, Cole asserted that nudity and exercising with offspring were part of Japanese custom. But he continued to be evasive about precisely why the touching had taken place. McGillivray, proclaiming that "I don't feel like I'm getting the whole truth here," then resurrected the mock polygraph technique. This quickly yielded Cole's ultimate admission—that he had touched C.C. for his own sexual gratification.[11]

9.  (OM): What kind of help?
    (GC): Mental.
    (OM): You agree with me then?
    (GC): Yes.
    (OM): Why don't you tell me the problem that we've got goin' at home? The only reason I do that is just, I wanna hear it from you, an' I wanna know your side of the story so we know which kind a help we need to get.

10. (GC): I need psychological help.
    (OM): And why is that?
    (GC): I should never have put my daughter through (inaudible). It's not right.
    (OM): Tell me about it.
    (GC): I don't know what to say.
    (OM): Tell me what happened a month and a half ago when you caught her smoking.
    (GC): I'll remember the best that I can.
    (OM): Tell me about the deal that you made with her. And I know this is hard, George. I mean, I understand, an' that's why I'm here, is, you know, like I say, we need to get to the truth so that we can get it corrected. Okay.
    (GC): I just. I need help.
    (OM): But to do that, you need to tell me what happened.
    (GC): (sighs) Uh.
    (OM): Okay, George.
    (GC): I, I need help.
    .... [interruption as tape changed]
    (OM): ... Uh, e', George, you were just, you know, like I was telling you before, I need, I need to you to tell me what happened. An' I know it's tough, an' I know it's hard, and you know, you've told me that you needed help and I'd like to see you get the help. And, but for

you to do that, I need you to tell me what happened with your daughter, [C.C.]. An' uh, did you make a deal with her that day when you caught her smoking?

11. (OM): Why do you feel you have to make a deal with her to get her to do this.
    (GC): I don't know.
    (OM): Are you sure you don't know.
    (GC): Unless I ...
    (OM): I wish ...
    (GC): Unless, unless ...
    (OM): I wish that you'd get back, again I'll go back to the polygraph.
    (GC): Uh huh.
    (OM): Okay. If a polygraph operator asked you which we may still do.
    (GC): Okay.
    (OM): Because I don't feel like I'm getting the whole truth here.
    (GC): Okay.
    . . . .
    (OM): Alright, just let me finish, if a polygraph operator asked you, when you made the deal with [C.C.] for her to partake in this type of training. Was it for Ninja purposes or your own personal pleasure. How would you answer that?
    (GC): I'll probably truthfully have to say my own personal pleasure.
    (OM): So in reality the training had nothing to do with all of this.
    (Inaudible—both speaking.)
    (OM): Right.
    (GC): Yeah cos I probably used that as an excuse.

## THE TRIAL COURT'S RULING

In rejecting Cole's motion to suppress his confession as involuntary, Judge Cranston found that McGillivray's references to the polygraph test were "most probably impermissible." Nevertheless, the judge found nothing improper in the officer's representations that a tape-recording had been surreptitiously made pursuant to a *Glass* warrant. Judge Cranston further found that it was this latter ruse, rather than the prospect of a polygraph examination, that caused Cole to confess. For this reason, the judge concluded that Cole's confession was voluntary.[12]

## THE STATE'S POSITION

On appeal, the state does not dispute Judge Cranston's conclusion that McGillivray's references to the polygraph were improper. The state argues, however, that Judge Cranston correctly found that these references did not cause Cole to confess. The state concurs with Judge Cranston's finding that Cole confessed because of McGillivray's deceptive claim that the police had surreptitiously recorded the October 10 exercise session. According to the state, Judge Cranston properly concluded that this ruse was permissible.

**12.** In relevant part, the superior court's order stated:

The court recognizes that the statements made by the officer regarding the polygraph are most probably impermissible and had the confession flowed from the threat of the polygraph, the court would have to suppress the statements. However, the statements regarding the Glass warrant do not make the confession involuntary and the court finds it is this portion of the interview which led to the defendant's confession. Thus, while there may have been some exertion of improper influence, the confession did not result from that exertion.

Viewing the totality of the circumstances, including the defendant's age, mentality, frequency of the interrogation, the existence of threat and inducement, and the defendant's lack of a criminal history, the defendant's Motion to Suppress and Dismiss Indictment IS HEREBY DENIED. (Footnote omitted.)

**13.** Specifically, the court stated:

We also believe that a considerable amount of litigation and the necessity of ruling some confessions inadmissible may be avoided if the police give warnings in all cases before administering polygraph tests. We think that good practice dictates that police specifically inform suspects of their rights "to refuse to take the [lie detector] test, to discontinue it at any point, and to decline to answer any individual questions." *United States v. Little Bear*, 583 F.2d 411, 414 (8th Cir.1978). We also take this occasion to recommend to the police that full *Miranda* warnings be given in any case where it is doubtful whether the suspect taking the lie detector test is in custody. *Hunter*, 590 P.2d at 901.

**14.** *See, e.g.,* Wayne R. LaFave & Jerold H. Israel *Criminal Procedure* § 6.2, at 447 (1984) (observing that, while courts generally allow interrogating officers some latitude for trickery concerning the strength of the evidence, "[c]ourts are much less likely to tolerate misrepresentations of law."). *Cf.* Wayne R. LaFave *Search and Seizure* § 8.2(c), at 653 (1996) ("[I]t may generally be said that a threat to *obtain* a search warrant is likely to be held to invalidate a subsequent consent if there were not then grounds upon which a warrant could issue[.]").

## ANALYSIS

### *The Polygraph Ruse*

Insofar as the trial court recognized McGillivray's polygraph tactics to be problematic, the court's ruling seems quite sound. In *Hunter v. State*, 590 P.2d 888 (Alaska 1979), the supreme court took stock of the coercive dangers arising from the interplay between police interrogation and the polygraph, and the court expressly warned law enforcement agencies to avoid those dangers.[13] Despite these warnings, McGillivray pressed Cole to submit to a polygraph examination without advising him that he had no obligation to do so. To the contrary, McGillivray advised Cole that the district attorney had authorized a test; and McGillivray threatened that, if necessary, he would obtain a court order requiring Cole to take one.

In actuality, the district attorney had given McGillivray no authority to put Cole on the polygraph, and McGillivray certainly could not have obtained a court order requiring Cole to take a polygraph test. The issuance of such an order obviously would have contravened Cole's privilege against self-incrimination. McGillivray clearly overstepped permissible limits by threatening Cole with a court-ordered polygraph,[14] and he strayed

even further beyond those limits by exploiting this threat through the use of a protracted mock polygraph examination.

### Causation

Although we agree with Judge Cranston that McGillivray's polygraph ruse was, to say the least, "most probably impermissible," we find other aspects of the trial court's ruling troubling.

■ The trial court's finding that McGillivray's repeated references to a polygraph test did not cause Cole to confess is inaccurate in that it ignores the final stage of the interrogation, when Cole expressly admitted that he had derived sexual pleasure from touching his daughter—perhaps his most incriminatory admission. This admission came in direct response to McGillivray's resumption of the mock polygraph interrogation.

Quite apart from this inaccuracy, the trial court's ruling is unrealistic in its view that Cole's earlier admissions resulted solely from the *Glass* warrant ruse, and not from McGillivray's use of deceptive polygraph tactics. Causal relationships seldom come so neatly packaged. For example, in the bullring, the matador delivers the mortal wound by a quick stroke of the blade between the bull's shoulders. But the bull is exposed to the matador's sword only because a calculated series of precisely-inflicted lesser wounds have exhausted the bull's neck and shoulders, causing the bull to stand vulnerable, head to the ground. To say that the matador's sword kills the bull is undeniably accurate; to say that the relentless and excruciating preliminary ritual plays no part is absurd.

Just so here. When McGillivray picked up the muleta and sword of the *Glass* warrant ruse, he faced a suspect already vulnerable. Though Cole had resisted McGillivray's polygraph deception during the early phase of the interrogation, his will had been sorely tested, and his resolve had most certainly weakened. Cole had accepted at face value McGillivray's threat to subject him to a court-ordered polygraph examination if necessary. As McGillivray shifted to the *Glass* warrant phase of the interrogation, he never withdrew his earlier threat of a court-or-dered polygraph; he kept it always in the background, poised for use as necessary. And as we have seen, McGillivray in fact returned to the tactic and used it quite effectively to extract Cole's ultimate admission of sexual purpose.

To assert that McGillivray's threat of a court-ordered polygraph examination and its accompanying mock polygraph inquiry were causally unrelated to Cole's confession is to push compartmentalized thinking to an unjustified extreme.

### The Glass Warrant Ruse

Also troubling is the trial court's conclusion that McGillivray acted properly in telling Cole that the police had obtained a *Glass* warrant and surreptitiously tape-recorded the prior night's exercise session. In concluding that this tactic was permissible, Judge Cranston relied on *Sovalik v. State*, 612 P.2d 1003 (Alaska 1980), which the state had cited for the proposition that trickery in interrogation is inoffensive. The state continues to rely on *Sovalik*, urging us to uphold the trial court's decision because "[t]he use of these types of interview techniques violate[s] due process only if they are likely to result in an untruthful confession." In our view, however, the state reads too much into *Sovalik* and overstates the significance of reliability as a component of voluntariness.

In *Sovalik*, the defendant made incriminating statements after he "was told, untruthfully, that his fingerprint had been found on a bottle at the scene of the crime[.]" *Id.* at 1007. After carefully reviewing the totality of the circumstances and finding nothing else remotely coercive, the supreme court held that "this artifice [involving the fingerprint] was not coercive and is not one which would have a tendency to produce an untruthful confession." *Id.* at 1007 (footnotes omitted).

In an accompanying footnote, the court cited *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), for the proposition that "[t]rickery in obtaining a confession is one factor to be considered in determining whether it is voluntary." *Sovalik*, 612 P.2d at 1007 n. 4. Citing a 1965 A.L.R. annotation, the court went on observe that "the use of trickery does not per se render a confes-

sion involuntary and most authorities hold that confessions produced by trickery are admissible so long as the device employed would have no tendency to produce an untruthful confession." *Id.*

The state attempts to inflate this footnote's passing reference to the A.L.R. annotation as the current state of Alaska law. But the supreme court's holding in *Sovalik* is actually somewhat narrower, for the text of the opinion states that the trickery in Sovalik's case was inoffensive, not only because it was unlikely to cause an unreliable confession, but also because it was not coercive: "this artifice was not coercive *and* is not one that would tend to produce an untruthful confession." *Id.* at 1007 (emphasis added) (footnote omitted).[15]

The focus in *Sovalik* on coerciveness as an important factor in determining the permissibility of the deceptive interrogation technique comports with the prevailing view. *See generally* Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 6.2(c), at 446–48 (1984); Welsh S. White, *Police Trickery in Inducing Confessions*, 127 U. Pa. L.Rev. 581 (1979). This focus on coerciveness also comports with the basic due process values reflected in the voluntariness requirement itself.

"[A] complex of values underlies the stricture against use by the state of confessions which, by way of convenient shorthand, this Court terms involuntary[.]" *Blackburn v. Alabama,* 361 U.S. 199, 207, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960). "While it is fair to say that ensuring the reliability of confessions is *a* goal under the due process voluntariness standard, it is incorrect to define the standard in terms of that one objective." LaFave & Israel, *supra,* at 442 (emphasis in original).

Indeed, the goal of ensuring reliability appears to be secondary to others.[16] Speaking of the Due Process Clause of the Fourteenth Amendment, the United States Supreme Court has said: "The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false." *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941). The Court has recognized that "[t]he use of coerced confessions, whether true or false, is forbidden because the method used to extract them offends constitutional principles." *Lego v. Twomey,* 404 U.S. 477, 485, 92 S.Ct. 619, 624, 30 L.Ed.2d 618 (1972). And it has emphasized that "ours is an accusatorial and not an inquisitorial system—a system in which the State ... may not by coercion prove its charge against an accused out of his own mouth." *Rogers v. Richmond,* 365 U.S. 534, 541, 81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961).

More recently, the Court has found:

The locus of the [voluntariness] right [in the Due Process Clause of the Fourteenth Amendment] is significant because it reflects the Court's consistently held view that the admissibility of a confession turns as much on whether the techniques for

---

**15.** In *Carr v. State,* 840 P.2d 1000 (Alaska App. 1992), this court followed the lead set in the text of *Sovalik,* finding that "deceptive tactics are not *per se* impermissible under Alaska law and will violate due process only when they are coercive or tend to produce an untruthful confession." *Carr,* 840 P.2d at 1004 n. 1. The state cites *Marcy v. State,* 823 P.2d 660 (Alaska App.1991), in support of its contention that trickery of the kind involved in this case is permissible unless likely to result in an untruthful confession. But in *Marcy* we merely set out, *verbatim,* the text and footnote of the supreme court's decision in *Sovalik;* we made no effort to interpret their meaning.

**16.** *See, e.g., United States v. Tingle,* 658 F.2d 1332, 1334–35 (9th Cir.1981) (internal citations omitted):

The reasons for excluding a coerced confession were explained fully by the Court in *Jackson [v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) ]. First, confessions obtained in a coercive manner are likely to be unreliable. More important, involuntary confessions are forbidden

because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will," and because of "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves."

extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne.

*Miller v. Fenton,* 474 U.S. 104, 116, 106 S.Ct. 445, 452–53, 88 L.Ed.2d 405 (1985).[17]

These precedents make it clear for the present case that the propriety of McGillivray's deceptive claim concerning evidence obtained pursuant to a *Glass* warrant must be measured, not by its tendency to produce an unreliable confession, but in broader terms of its potential for coerciveness in light of the totality of the circumstances. Only by applying this broader measure can we determine whether this technique, as applied to Cole, was "compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means[.]" *Miller,* 474 U.S. at 116, 106 S.Ct. at 452–53.

As noted in *Sovalik* and confirmed by La-Fave, courts generally find that misrepresenting the existing strength of the state's case will not itself render a confession involuntary. *See Sovalik v. State,* 612 P.2d 1003, 1007 (Alaska 1980); LaFave & Israel, *supra,* at 446. But McGillivray's *Glass* warrant deception involves elements that go beyond mere misrepresentation as to strength. The warrant requirement adopted in *State v. Glass,* 583 P.2d 872 (Alaska 1978), reflects the Alaska Supreme Court's recognition that surreptitious electronic monitoring constitutes a significant invasion of personal privacy; here, McGillivray's deception involved a fictitious intrusion into the privacy of Cole's home.

The breach of privacy that would have been necessary to obtain a surreptitious tape-recording of the October 10 exercise session and the purported involvement of a judicial officer in that breach arguably added a dimension of coerciveness to the misrepresentations in Cole's case. Already facing the prospect of a court-ordered, district-attorney-authorized lie detector test arranged by a police officer who had repeatedly accused him of lying, and now confronted with new revelations that a judge had sanctioned a surreptitious intrusion into his privacy, which supposedly yielded an incriminating tape-recording, Cole might justifiably have felt that the forces of government were squarely aligned against him and that any further effort to remain silent would be futile.

### The Benign Investigative Purpose Ruse

We need not decide whether the *Glass* warrant deception, standing alone, would have been impermissible. Because the totality of the circumstances are to be considered in determining the voluntariness of Cole's confession, the propriety of McGillivray's reliance on the *Glass* warrant tactic cannot be determined in the abstract, but must instead be decided in light of other coercive elements of Cole's interrogation. Principal among these are the polygraph threat and McGillivray's repeated assurances that the purpose of the interrogation was to get needed help for Cole and/or his family. We have already discussed at length the polygraph ruse and its interplay with the *Glass* warrant deception. McGillivray's assurances of a benign investigative purpose remain to be considered.[18]

---

**17.** Notably, one year after *Miller,* in *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986), the Court appears to have questioned whether ensuring reliability is in itself a constitutionally significant consideration: "A statement rendered by one in the condition of respondent might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum ... and not by the Due Process Clause of the Fourteenth Amendment."

**18.** In the trial court, Cole did not claim that it was improper for McGillivray to give repeated assurances that his only purpose was to get help

for Cole and his family. Cole develops this aspect of his involuntariness claim for the first time on appeal. The state correctly refrains from arguing that Cole's failure to raise the point below precludes him from arguing it here. As the supreme court observed, a defendant "need not have expressly presented every theory supporting an argument before the trial court, but can expand or refine details of an argument otherwise preserved on appeal." *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985) (citing *Deal v. State,* 626 P.2d 1073, 1077 (Alaska 1980)). A party on appeal is free to expand points raised in the trial court if the expanded points "1) do not depend on new

Despite strong language to the contrary in early Supreme Court decisions like *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897),[19] it is now well established that the Constitution does not altogether forbid the police from making promises or offering inducements to a suspect under interrogation. Ordinarily, promises and inducements are "not improper as long as, under the totality of the circumstances, the defendant's confession is voluntary." *Harris v. State,* 678 P.2d 397, 405–06 (Alaska App. 1984), *rev'd on other grounds sub nom., Stephan v. State,* 711 P.2d 1156 (Alaska 1985); *see also Stobaugh v. State,* 614 P.2d 767, 772 (Alaska 1980) (rejecting a *per se* rule which would condemn any incriminating statement obtained by means of a promissory inducement). Thus, the fact that an interrogator is sympathetic or friendly toward a defendant, or professes a general desire to help, does not in itself render a subsequent confession involuntary. *See, e.g., Thompson v. State,* 768 P.2d 127, 131–32 (Alaska App.1989); *Chase v. State,* 678 P.2d 1347, 1355 (Alaska App.1984).

Some promises and inducements, however, have been held inherently coercive and deemed *per se* improper. For example, promises of immunity are generally forbidden, *Smith v. State,* 787 P.2d 1038, 1039 (Alaska App.1990), as are inducements forcing a suspect to choose between the right to silence and other significant rights or benefits, *see, e.g., Webb v. State,* 756 P.2d 293, 297 (Alaska 1988) (finding *per se* invalid a *Miranda* waiver elicited by a police officer's threat to retain the defendant's driver's license unless the defendant spoke).

A large gray area of uncertainty separates the clearly permissible inducement, such as an interrogating officer's expression of a generalized desire to help a suspect, and a clearly impermissible inducement, such as a promise of immunity. Within this gap, "the cases go both ways[.]" LaFave & Israel, *supra,* at at 446.

For the most part, McGillivray's repeated assurances that his only purpose was to make sure that Cole got help seem to fall somewhere within the gray area, arguably landing closer to the impermissible than the permissible boundary. McGillivray did not merely express a general interest in helping Cole; he professed that this was the exclusive goal of the interrogation and that he needed to hear from Cole to determine precisely what kind of help to arrange: "The only reason I do that is just, I wanna hear it from you, . . . so we know which kind a help we need to get."

At two points, however, McGillivray's assurances crossed into clearly impermissible territory. After Cole acknowledged, "I need help," he seemed reluctant to reveal any further details. Responding to Cole's reluctance, McGillivray twice insisted that Cole would have to reveal the details of his conduct before he would be helped: "[W]e need to get to the truth so that we can get it [Cole's problem] corrected." "[Y]ou've told me that you needed help and I'd like to see you get the right help. And, but for you to do that, I need you to tell me what happened with your daughter[.]" By making these statements, McGillivray in effect told Cole that the psychological help Cole had requested would be withheld unless and until Cole confessed.

---

or controverted facts; 2) are closely related to the appellant's arguments at trial; and 3) could have been gleaned from the pleadings." *Arnett v. Baskous,* 856 P.2d 790, 791 n. 1 (Alaska 1993) (citing *O'Callaghan v. State,* 826 P.2d 1132, 1133 n. 1 (Alaska 1992)). Cole's argument that McGillivray's repeated assurances of a benign interrogative purpose had a coercive impact on the interrogation readily meets these three criteria. Cole's argument is inherently related to his general claim of involuntariness—a claim that he clearly asserted below. Particularly because the trial court was required to determine the voluntariness of Cole's confession based on the totality of the circumstances surrounding the interroga-

tion, *Sprague v. State,* 590 P.2d 410, 414 (Alaska 1979), Cole's argument concerning the coercive aspect of McGillivray's assurances "is a permissible expansion of the general argument raised below." *Deal,* 626 P.2d at 1078.

**19.** *Bram* held that a confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of improper influence." *Bram,* 168 U.S. at 542, 18 S.Ct. at 187; *see also Sovalik v. State,* 612 P.2d 1003, 1006 (Alaska 1980) (quoting *Bram* ).

When viewed in light of these emphatic declarations that Cole would not be helped unless he cooperated fully, McGillivray's earlier assurances that his sole purpose was to get Cole help became unmistakably coercive. A review of the interrogation as a whole leaves the indelible impression that, by unrelentingly combining these false assurances with the other deceptions we have already discussed, McGillivray managed to achieve a synergistic effect—one that yielded an overall level of coerciveness dramatically surpassing the sum of its component parts.

### SUMMARY AND CONCLUSION

■ Cole had no prior experience in the criminal justice system when he was questioned by McGillivray and does not appear to have been particularly sophisticated. Although his interrogation was not unusually lengthy, it was conducted at the station house, in a confined and evidently somewhat uncomfortable setting. Cole was alone with McGillivray; the prevailing atmosphere was certainly police-dominated. While Cole was repeatedly advised that he would not be arrested, this advice was tempered by McGillivray's threat to obtain a court order requiring Cole to submit to a polygraph test. Throughout the interrogation, Cole was subjected to an unrelenting and constantly shifting array of deceptive tactics—the threat of a court-ordered polygraph test, mock polygraph questioning, false claims of a surreptitious recording obtained pursuant to an electronic surveillance warrant, and repeated assurances that McGillivray's only interest was in helping Cole and his family. Cole was twice told that he could obtain help only if he confessed fully.

The totality of these circumstances convinces us that Cole's confession was obtained "by ... psychological coercion or by improper inducement so that [Cole's] will was overborne." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir.1988) (citing *Haynes v. Washington*, 373 U.S. 503, 513–14, 83 S.Ct. 1336, 1342–44, 10 L.Ed.2d 513 (1963)). No civilized person can condone sexual assault of children; it is a problem of seemingly epidemic proportions in contemporary society—a problem that cries out for solution. But surely the solution does not lie, and just as surely under time-honored American legal tradition it cannot lie, in the use of blatantly coercive interrogation techniques to extract confessions from suspected offenders. We hold that the confession was involuntary and that the trial court erred in denying Cole's motions to suppress his confession and dismiss his indictment.[20]

The conviction is REVERSED.

---

20. The state advances a perfunctory argument that admission of Cole's confession before the grand jury and at trial amounted to harmless error. In *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the United States Supreme Court for the first time held the harmless error doctrine applicable, under the federal constitution, to a conviction in which an involuntary confession was introduced against the accused. Alaska appellate courts have not considered whether the harmless error doctrine would apply to such cases as a matter of state constitutional law. We need not do so here. "A defendant's confession is probably the most probative and damaging evidence that can be admitted against him[.]" *Id.* at 292, 111 S.Ct. at 1255 (Justice White, dissenting) (internal quotations and citations omitted). Assuming the harmless error doctrine applies, we are not persuaded that admission of Cole's confession at trial was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Nor do we find it likely that the confession did not "have ... an overriding influence on the [grand] jury's decision." *See Boggess v. State*, 783 P.2d 1173, 1176 (Alaska App.1989). The error here was not harmless, either in the grand jury setting or at trial.