NOT DESIGNATED FOR PUBLICATION

Nos. 125,094
125,095

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CODY WILLIAM SCHULTZ,
*Appellant*.


MEMORANDUM OPINION

Appeal from Ellis District Court; GLENN R. BRAUN, judge. Submitted without oral argument. Opinion filed February 9, 2024. Affirmed.

*Hope Faflick Reynolds*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor, and *Kris W. Kobach*, attorney general, for appellee.


Before HILL, P.J., MALONE and ISHERWOOD, JJ.


PER CURIAM: Cody William Schultz was convicted of aggravated indecent liberties with a child, electronic solicitation of a child, and rape. His conviction rested, in part, on incriminating statements that Schultz made to police on the day of his arrest. Prior to trial, he moved the court to suppress those statements, but his request was denied following a hearing. Schultz urges this court to reach a contrary finding regarding the voluntariness of his statements on the grounds that he was not adequately *Mirandized*, his will was overborne during the interview, his statements were the product of coercion, and officers failed to execute his arrest warrant properly. We have thoroughly reviewed the

1

totality of the circumstances from the record before us and find no error in the district court's conclusion. The denial of Schultz's motion to suppress is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

In December 2019, twelve-year old N.D. confided in a library staff member that she had a sexual encounter with an older man whom she met on Snapchat. N.D. could only identify him by his Snapchat username. The staff member notified the police, who came to the library and talked with N.D. about the encounter. Afterwards, they collected N.D.'s phone, along with her shirt and shoe because both had semen on them.

The police sent N.D.'s shirt and shoe to the KBI for DNA testing and submitted an emergency request to Snapchat for information on the identified username. Snapchat responded with records of pictures and conversations associated with that username. The photos included a picture of Schultz, and the records contained a conversation Schultz shared with another underage girl, J.D. During that exchange, Schultz discussed sexual acts and continued to do so after J.D. advised him that she was only 13 years old. He even went so far as to suggest that they engage in such sexual activity together. Armed with the information provided by N.D. and Snapchat, the police obtained a search warrant for Schultz's residence, his electronics, and two of his vehicles. The warrant also extended to his body so DNA evidence could be collected.

Detective Burkholder of the Hays Police Department made an audio recording of law enforcement's encounter with Schultz at his home during the execution of the search warrant. Approximately six officers were present at the scene, either in the front of the house or in the back to guard the perimeter, and approached with handguns and rifles drawn due to the severity of the allegations and information they received that indicated Schultz possessed firearms in his residence.

2

Detective Burkholder and Special Agent Thayer knocked on the front door and when Schultz's fiancée answered, the officers informed her they needed to talk to Schultz. When Schultz came to the door, he was asked to step outside, at which time officers handcuffed him and proceeded with execution of the search warrant.

Once Schultz was handcuffed, approximately three of the officers left the scene. Detective Burkholder read Schultz his *Miranda* rights, and Schultz verbally indicated that he understood. Burkholder spoke with Schultz for roughly two minutes and Schultz acknowledged that he used his Snapchat account to meet a girl who said she was 18 but claimed he left upon learning she was not actually that old. At that point, Schultz was transported to the Ellis County Law Enforcement Center for further questioning. During the ride, Schultz made unsolicited incriminating statements, which were recorded by Detective Hancock. Schultz asked Hancock, "what's this all about," to which the detective simply responded, "she's 12, man." Schultz reiterated that he met with a girl who claimed to be 18 years old but once she told him she was only 12, after they already started "messing around," he took off running.

At the Law Enforcement Center, while waiting to be formally interviewed, Schultz agreed to prepare a written statement. Before he did so, officers inquired whether Burkholder had advised him of his *Miranda* rights and if he had agreed to speak with the detective. Schultz responded affirmatively to both questions. The police then requested that Schultz "go into detail" and stated, "there is more than one incident, so you need to talk about them all."

In his written statement, Schultz admitted to meeting a girl on Snapchat and performing sexual acts with her at a park. He also stated that she brought a friend with her who wanted to join in the sexual activity. He claimed that just as he ejaculated, the girl told him that her friend was only 13 so he immediately "took off running." Schultz concluded his written statement with a description of a separate incident involving a

different girl he met on Snapchat who claimed to be 18, but that he stopped talking to her after learning "she was not who she said she was."

Detective Burkholder conducted a formal interview with Schultz and inquired whether he recalled the *Miranda* warnings he received earlier; Schultz indicated that he did. The detective then told Schultz that his "end goal in all this is to get you help so you can get back to your family." Schultz informed Burkholder that he is schizophrenic, and he initially attempted to control it with medication and therapy but it "made [him] feel weird." He then explained his version of events, which essentially simply recounted the version of events he outlined in his written statement, plus a few additional details. He also relinquished the password for his Snapchat account. The collective time Schultz spent in police custody amounted to less than four hours.

DNA was collected from Schultz and the sample ultimately revealed that he could not be excluded as a contributor for the semen found on N.D.'s shirt and shoe. That sample further indicated that Schultz could not be excluded as the contributor of semen that was part of a rape kit for an unsolved 2014 case where a woman, M.E., was raped by an unknown assailant. The results gave rise to charges against Schultz in two separate cases. In 20-CR-2, the State charged him with (1) aggravated indecent liberties with N.D. and (2) electronic solicitation of J.D. In 20-CR-328, he was charged with the rape of M.E.

Prior to trial, Schultz moved to suppress the incriminating statements he made to law enforcement officers. The district court denied his motion and ruled the statements were admissible. Specifically, the district court found that officers were under no obligation to re-*Mirandize* Schultz at the Law Enforcement Center. It also rejected Schultz's contention that his statements were the product of coercion or impermissibly elicited while he was exhibiting signs of mental problems. Finally, the district court addressed Schultz's complaints concerning execution of the search warrant and determined that law enforcement was justified in bringing more officers and firearms to

4

Schultz's residence due to the potential threat of violence and that overall, the officers conducted themselves in a non-threatening, respectful manner during its execution.

The parties engaged in mediation and agreed to proceed to a bench trial on stipulated facts, then consolidate the two cases for sentencing. Schultz was convicted as charged and received consecutive prison sentences of 186 months and life with a mandatory minimum term of 25 years in prison for the child sex offenses, and another consecutive prison sentence of 186 months for the rape conviction.

Schultz now brings his case to our court for an analysis of the district court's denial of his motion to suppress.

LEGAL ANALYSIS

*The district court properly declined to suppress the voluntary statements Schultz made to law enforcement officers.*

*Standard of Review*

An appellate court reviews the district court's decision on a motion to suppress using a bifurcated standard. *State v. Gilliland*, 294 Kan. 519, 545, 276 P.3d 165 (2012), *cert. denied* 568 U.S. 1176, 133 S. Ct. 1274, 185 L. Ed. 2d 211 (2013). Without reweighing the evidence, the district court's findings are reviewed to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion regarding the suppression of evidence is then reviewed using a de novo standard. When the facts material to a trial court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review. 294 Kan. at 545.

"The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Mallory v. Hogan*, 378 U.S. 1, 8, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). Under the right against self-incrimination, a defendant's statement is inadmissible at trial if it is involuntary. An involuntary statement is one made when the will of the suspect was overborne. To be admissible, the statement must be made "freely, voluntarily, and without compulsion." *Haynes v. Washington*, 373 U.S. 503, 513, 83 S. Ct. 1336, 10 L. Ed. 2d 513 (1963). The list of nonexclusive factors a district court must consider when looking at the totality of the circumstances to determine whether a defendant's statements are voluntary is the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation." *State v. Morris*, 255 Kan. 964, 971, 880 P.2d 1244 (1994).

The bare fact of police detention and questioning in private do not render a detainee's statements involuntary. *Crooker v. California*, 357 U.S. 433, 437, 78 S. Ct. 1287, 2 L. Ed. 2d 1448 (1958). Rather, to establish involuntariness, a defendant needs evidence of coercive police conduct causally related to the statements at issue. *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). Mere trickery by the police does not necessarily amount to coercive police conduct. See *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969) (suspect was not coerced when his confession was prompted by police falsely telling him that his co-defendant confessed). However, conduct that cannot obviously be defined as coercive may nonetheless give rise to a claim of involuntariness if it is sufficiently egregious. To meet that designation the challenged conduct must be particularly shocking to the conscience, such as that which is intended to injure in some way and is unjustifiable by any government interest. *Chavez v. Martinez*, 538 U.S. 760, 775, 123 S. Ct. 1994, 155 L. Ed. 2d 984 (2003).

*Schultz's* Miranda *Rights*

We first undertake an analysis of Schultz's claim that the *Miranda* warnings he received were insufficient to ensure his understanding of the same given that officers only provided the warnings verbally, within minutes of his arrest, and failed to re-*Mirandize* him between interviews. We are not persuaded that these factors cast a pall over Schultz's statements such that they render the statements involuntary.

Generally, statements uttered during a custodial interrogation are only admissible at trial if they were accompanied by particular procedural safeguards which ensured that a defendant's privilege against self-incrimination was adequately protected. Such safeguards include informing the person in custody, prior to interrogation, of his or her Fifth Amendment rights to remain silent, to consult with an attorney, and to have an attorney present during interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). In determining whether law enforcement officers adequately complied with *Miranda*, the inquiry is simply whether the warnings reasonably conveyed the suspect's rights. *Florida v. Powell*, 559 U.S. 50, 60, 130 S. Ct. 1195, 175 L. Ed. 2d 1009 (2010).

Schultz's first complaint concerning the *Miranda* warnings he received is that law enforcement officers only provided him with the warnings in a verbal format. While not directly addressed by Kansas courts, other states have declined to find that law enforcement officers are required to issue *Miranda* warnings both verbally and in writing. See *Matter of A.S.*, 163 N.E.3d 1143, 1150 (Ohio Ct. App. 2020) (proper for detective to give only verbal *Miranda* warnings to minor prior to interview); *People v. Fiorino*, 130 A.D.3d 1376, 1379, 15 N.Y.S.3d 498(2015) (proper for police to give only verbal warnings to defendant prior to interview). These cases suggest there is no requirement that *Miranda* warnings be issued in both formats in order for Schultz to receive the protections to which he is entitled and to ensure his subsequent statements are properly

considered voluntary. We are convinced that what is contemplated by *Miranda* was satisfied here when Detective Burkholder verbally informed Schultz of those rights, Schultz communicated that he understood the same and agreed to speak with the detective and failed to assert his right to remain silent or his right to an attorney.

Schultz's next complaint consists of the claim that officers were required to re-*Mirandize* him after he was transported to the Law Enforcement Center. The question of whether a suspect should be re-*Mirandized* after a waiver is one of law that this court answers by considering the totality of the circumstances. A key factor in the analysis is the time between the initial waiver and the statements sought to be suppressed. *State v. Ransom*, 288 Kan. 697, 706-07, 207 P.3d 208 (2009).

The total time that Schultz was in police custody and subject to questioning amounted to less than four hours. This is a reasonable period for a suspect to go without triggering the need for he or she to be reminded of their *Miranda* rights. See *United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995) (24-hour interval between waiver of *Miranda* rights and defendant's statement to law enforcement was reasonable); *Stumes v. Solem*, 752 F.2d 317, 320 (8th Cir. 1985) (5-hour interval between waiver of *Miranda* rights and defendant's statement to law enforcement was reasonable); *People v. Gonzalez*, 5 A.D.3d 696, 697, 774 N.Y.S.2d 739 (2004) (11.5 hours after first questioning defendant was reasonable).

A thorough review of the totality of the circumstances makes clear that law enforcement officers honored Schultz's rights under *Miranda*. Again, officers gave the required advisement, Schultz indicated that he understood those warnings and opted to waive the same. The facts of this case do not give cause to issue repeat warnings. Thus, their absence fails to demonstrate that Schultz's statements to police were involuntary.

*Execution of the Search Warrant*

Schultz next argues that his statements should be suppressed because they were the product of coercion given the manner in which law enforcement officers executed their search warrant. Specifically, he directs our attention to his warrantless arrest and the officers' "significant and intimidating show of force" as examples of excessive conduct. We have analyzed the claim and disagree with Schultz's contention that these factors reflect that his statements to the officers were involuntary.

For Fourth Amendment purposes, a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupant of the premises while a proper search is conducted. If the search then uncovers evidence establishing probable cause to arrest the occupant, that arrest is constitutionally permissible. *Michigan v. Summers*, 452 U.S. 692, 704-05 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981). This rule serves two legitimate law enforcement interests: (1) preventing flight in case incriminating evidence is found, and (2) minimizing the risk of harm to officers. 452 U.S. at 702.

Under *Summers*, it is immaterial that Schultz was arrested without an arrest warrant. He was initially detained pursuant to the search warrant which was a detention that is justified by the dual law enforcement interests identified in *Summers*. Due to the severity of the crime and Schultz's ownership of firearms, there were legitimate risks that Schultz would either attempt to flee or harm officers. While detained, Schultz was read his *Miranda* rights and opted to utter incriminating statements. At this point, probable cause was established, so the officers transported Schultz to the Law Enforcement Center for further questioning. We detect nothing unlawful in that phase of the encounter and thereby reject Schultz's first contention that his warrantless arrest demanded suppression of the statements that followed.

As for the show of force exhibited by the officers, it is worth noting that they actually de-escalated the situation by the time Schultz was detained and questioned. That is, approximately half of the officers left the scene and those who remained holstered their weapons. Additionally, the record does not disclose, nor does Schultz highlight any evidence of disrespect exhibited by Detective Burkholder during the time he questioned Schultz. We decline to find that the law enforcement officers here engaged in the type of coercive conduct necessary to render Schultz's statements involuntary. Cf. *United States v. Perdue*, 8 F.3d 1455, 1466-67 (10th Cir. 1993) (defendant's statements were involuntary when questioned in an isolated area, face down in the dirt, with officer's guns aimed at him, prior to *Miranda* warnings, while police helicopters hovered overhead).

Nothing about the officers' execution of the search warrant on Schultz's property suggests that his incriminating statements were involuntarily made. To the contrary, Schultz was properly detained, and officers diffused the situation before the detective questioned Schultz. Therefore, we share the district court's conclusion that the claims advanced by Schultz fail to undermine the voluntary nature of the statements he made to officers.

*Police Interview Techniques*

Schultz's next claim of error is directed at the interview techniques employed by officers during his questioning at the Law Enforcement Center. Specifically, Schultz contends that officers incentivized him to cooperate by implying that if he simply confessed, they would allow him to leave and return home to his family. Schultz further asserts that it was improper for the officers to request that he be thorough and descriptive while confessing. For the reasons explained below, we find neither argument persuasive.

The first example Schultz offers as a foundation for his claim is a remark made by Detective Burkholder during the interview at the law enforcement center that his "end

goal in all this is to get you help so you can get back to your family." Schultz cites two out-of-state cases to support his argument that Burkholder's statement provided a false sense of security that can render a confession involuntary: *Cole v. State*, 923 P.2d 820 (Alaska Ct. App. 1996); and *State v. Howard*, 825 N.W.2d 32 (Iowa 2012).

In *Cole*, the Alaska Court of Appeals suppressed Cole's statements to law enforcement officers, partly because they falsely assured him that their questioning was motivated by a desire to help him and his daughter. 923 P.2d at 831-32. However, the Alaska court stated that these assurances by the officers, standing alone, "fall somewhere within the gray area, arguably landing closer to the impermissible than the permissible boundary." 923 P.2d at 831. More important to the court's holding were the statements made by officers which implied that the psychological help Cole requested would be withheld until he confessed. 923 P.2d at 831-32. These statements were also accompanied by what the reviewing court deemed to be two improper ruses. First, the officers falsely claimed that the district attorney had authorized a polygraph test and they threatened to obtain a court order requiring Cole to take one. In actuality, the issuance of a court order mandating that Cole submit to a polygraph test would infringe upon his right against self-incrimination. Second, the police falsely claimed that they obtained a warrant to electronically monitor and tape-record the crime that occurred the previous night. Thus, it was the totality of the circumstances that drove the Alaska court to conclude that Cole's statements were involuntary. 923 P.2d at 830.

*Cole* is readily distinguishable from the case before us given the existence of additional interrogation tactics found to be questionable. Notably, the Alaska court observed that "the fact that an interrogator is sympathetic or friendly toward a defendant, or professes a general desire to help, does not in itself render a subsequent confession involuntary." 923 P.2d at 831. This language arguably encompasses the tactics Schultz challenges from his interview. Thus, *Cole* actually suggests that, when occurring in

11

isolation, it was not improper for investigating officers to tell Schultz that their goal was to help him return home to his family.

The next out-of-state case cited by Schultz, *Howard*, 825 N.W.2d 32, is also distinguishable. In that case, the Iowa Supreme Court suppressed Howard's confession after finding that the officers misled him with an implied promise of leniency. That is, investigating officers improperly conveyed the false impression that, if Howard confessed, he would be sent to a treatment facility in lieu of further punishment. Unlike *Howard*, the language officers used while questioning Schultz never amounted to an inducement likely to cause a false confession. The police never implicitly or explicitly promised Schultz leniency in exchange for cooperation. Therefore, *Howard* does not serve to advance Schultz's claim that the officers' statements concerning their desire to help him return home was improper.

The same result emerges with an analysis of Kansas precedent. To render a defendant's statement involuntary, an officer must promise an "action to be taken by a public official." *State v. Garcia*, 297 Kan. 182, 196, 301 P.3d 658 (2013) (finding confession involuntary where officers withheld treatment for gunshot wound until after interrogation and promised leniency to induce the confession); *State v. Harris*, 284 Kan. 560, 579-80, 162 P.3d 28 (2007) (finding confession voluntary where officers only said that the prosecutor would view cooperation favorably and warned that the police had no power to make deals). No such promises were made to Schultz.

Turning to Schultz's contention that it was improper for the officers to request that he be thorough and descriptive while confessing, he fails to support his claim with any legal authority which firmly establishes that such requests are coercive. Therefore, we find the claim is waived. See *State v. Raskie*, 293 Kan. 906, 919, 269 P.3d 1268 (2012) (failure to support a point with pertinent authority is akin to failing to brief the issue).

We decline to find that any of the interview tactics used against Schultz crossed the line into coercion. It was not improper for Detective Burkholder to feign either sympathy or a desire to help during his questioning of Schultz. Nor was it improper for officers to request that Schultz provide a comprehensive and descriptive written statement.

*Schultz's Suspected Mental Disability*

Schultz's final point of error is that law enforcement officers failed to accommodate his suspected mental disability. This claim arises out of comments Schultz made during his interview at the Law Enforcement Center about his alleged schizophrenia. We are not persuaded that this issue amounts to error.

We believe that *State v. Mack*, 255 Kan. 21, 32, 871 P.2d 1265 (1994), offers a fair amount of guidance on resolution of Schultz's claim. In that case, Mack had a verifiable record of mental illness which rendered him incompetent to stand trial for a period of three months. Nevertheless, the Kansas Supreme Court found that Mack's mental health issues did not demand suppression of the statements he made to law enforcement officers. 255 Kan. at 32. In arriving at that conclusion, the court considered the absence of coercion exhibited by investigating officers, their respect for Mack's *Miranda* rights, Mack's voluntary waiver of those rights, and his ability to easily communicate with the officers. 255 Kan. at 32.

The sole difference between *Mack* and Schultz's case is that Mack could substantiate his mental illness. Here, the only evidence of Schultz's alleged schizophrenia are the statements he made during the interview at the Law Enforcement Center. Therefore, considering Schultz was properly *Mirandized*, he waived those rights and agreed to speak to officers, he participated in an interview that was not tainted by coercive tactics, and freely communicated with them, his case closely aligns with *Mack*

and warrants a similar outcome. We are not persuaded by Schultz's argument that his isolated comment concerning his struggle with schizophrenia strips his statements of their voluntary quality.

Considering the totality of the circumstances, it cannot be said that the incriminating statements Schultz made to investigating officers were involuntary. Each aspect of the officers' conduct that Schultz alleges to be coercive or otherwise improper was permissible under Kansas and federal law. Accordingly, the district court properly denied Schultz's motion to suppress.

Affirmed.